JUSTICE PATTERSON delivered the opinion of the Court.
*871 **301 Defendant Kareem T. Tillery was convicted of second-degree unlawful possession of a weapon and fourth-degree unlawful disposition of a weapon, arising from one of the five controlled purchases of weapons for which he was charged. The jury was unable to reach a verdict on the remaining charges. The trial court sentenced defendant to a twenty-year extended-term sentence for the second-degree offense and a concurrent nine-month sentence for the fourth-degree offense, and granted the State's motion to dismiss the remaining charges against defendant. The Appellate Division upheld defendant's conviction and sentence.
Defendant appeals his conviction on the ground that the trial court improperly admitted into evidence his statement to police. He asserts that although a New Jersey State Police detective **302 advised him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to his custodial interrogation, he did not expressly or implicitly waive those rights before answering questions. Defendant also challenges his twenty-year extended-term sentence for the second-degree offense, arguing that the court inappropriately considered his criminal record and evidence relating to charges as to which the jury failed to reach a verdict in applying three aggravating factors.
In a ruling entitled to substantial deference, the trial court concluded that the State had proven beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his Miranda rights. The trial court relied on defendant's prior experience with the criminal justice system, his decision to sign a Miranda card after being read his rights, and a comment made by defendant that the court construed to suggest that defendant understood his right not to speak with police.
Despite those and other factors supporting the court's finding of a Miranda waiver, we have significant concerns about the procedure that was followed in this case. Neither the script set forth on the State Police Miranda card nor the detective's statement to defendant addressed whether defendant agreed to waive his rights before answering questions. Consequently, when we apply the totality-of-the-circumstances analysis that governs defendant's challenge to the admission of his statement, the parties' dispute over defendant's Miranda waiver presents a close question.
We conclude, however, that any error in the trial court's admission of the statement was harmless beyond a reasonable doubt. With respect to the single weapon transaction for which defendant was convicted -- an informant's controlled purchase of a handgun from defendant -- the State presented overwhelming evidence of defendant's guilt, independent of defendant's statement. Accordingly, we concur with the Appellate Division's decision upholding defendant's conviction.
*872 We also agree with the Appellate Division's determination affirming defendant's sentence. It is undisputed that defendant met **303 the statutory criteria for a discretionary extended term. Although the State should have moved to dismiss the charges on which the jury had deadlocked before the court considered evidence relevant to those charges, we find no abuse of discretion in the court's application of three aggravating factors to impose an extended-term sentence at the high end of the statutory range.
Accordingly, we affirm as modified the Appellate Division's judgment.
I.
A.
We base our summary of the facts on the trial record.
In January 2013, a cooperating informant advised the New Jersey State Police that defendant was involved in the sale of weapons in Essex County. The Division of Criminal Justice authorized the State Police to consensually record telephone conversations between the informant and defendant.
The lead investigators, State Police Detectives Hugo Ribeiro and Miguel Holguin, arranged for the informant to conduct five controlled purchases of weapons from defendant. In each instance, the detectives met the informant at a secure site, searched him for contraband, and equipped him with a recording device. The detectives followed the informant as he drove to the location where he had agreed to meet defendant. They observed the informant and defendant at the location of the transaction and followed the informant back to the secure site designated for his meeting with the officers, ensuring that he made no stops on the way. On each occasion, the officers retrieved from the informant the weapon that he identified as a weapon purchased from defendant, and subjected him to a second search of his person and vehicle.
The first controlled purchase took place on February 12, 2013 in the Newark grocery store where defendant worked. According to Detective Ribeiro, in a monitored telephone conversation, defendant **304 and the informant discussed the sale of a TEC-22 long rifle. Detective Ribeiro testified that he observed and videotaped defendant entering the grocery store carrying a white bag, and that the informant left the grocery store carrying the same bag. The detective stated that he later recovered from the informant a TEC-22 long rifle, two high-capacity magazines, and a sock filled with hollow-point bullets.
The second controlled purchase occurred on March 8, 2013, in the same grocery store. According to Detective Ribeiro and the informant, defendant sold the informant a .25 caliber handgun in the store. On that occasion, the recording device on the informant did not yield a clear recording, and no electronic record of that transaction was admitted into evidence. At the conclusion of the transaction, the detectives retrieved a loaded .25 caliber handgun from the informant.
The third controlled purchase, also in the Newark grocery store, occurred on March 28, 2013. According to the informant, he arranged by telephone to purchase a shotgun from defendant, who retrieved a duffel bag from the rear of the building when the informant arrived at the store. Again, the recording device failed to produce an understandable recording of the conversation between the informant and defendant, and no recording of that transaction was admitted into evidence. After leaving the grocery store, the informant turned over to the investigators a *873 Mossberg shotgun, which he identified as the weapon purchased from defendant.
The fourth transaction -- the sole transaction that gave rise to defendant's conviction -- occurred on April 3, 2013. The informant testified that he arranged to purchase a .38 caliber handgun at defendant's residence in Union, a location familiar to him from prior visits.[1] Detective Eric Greener, assigned to observe the **305 informant and defendant from a location near defendant's home, testified that he saw defendant leave his residence with a black plastic bag, enter the informant's car, remain in the car with the informant for four to five minutes, and return to his home without the plastic bag. The jury heard a conversation recorded by the informant in the car, in which defendant and the informant discussed a .38 caliber weapon. Following the transaction, officers recovered from the informant a loaded .38 caliber handgun.
The last of the five controlled purchases alleged by the State occurred at the Newark grocery store on April 29, 2013. By the informant's account, he and defendant met at the back of the store and discussed the sale of a single handgun and, although they initially disputed the terms of the transaction, they eventually agreed on a price. The recording device failed to produce a complete recording of the conversation between the informant and defendant, but it captured brief comments about the price. Detective Ribeiro testified that the informant entered the grocery store carrying nothing, and emerged from it carrying a black bag, from which the officers recovered a .44 caliber handgun loaded with four hollow-point bullets.
B.
State Police detectives arrested defendant at the Newark grocery store on August 22, 2013, and transported him to the Metro North Station in Irvington. After defendant was searched and briefly detained in a holding cell, Detective Ribeiro and Detective Holguin escorted him to an interrogation room and conducted an interview, which was audio-recorded and later transcribed.[2]
**306 After asking defendant about his background and employment, Detective Ribeiro presented a Miranda card labeled, "S.P. 429 (Rev. 11-73)." On the front side of the card, the Miranda rights were set forth. The card's reverse side stated, "I acknowledge that I have been advised of the constitutional rights found on the reverse side of this card," followed by signature lines for the "Accused or Suspect," the "Advising Officer," and the "Witnessing Officer," as well as spaces to record the date and time.
Evidently reading from the Miranda card, Detective Ribeiro advised defendant:
I'm gonna read you your rights ok alright you have the right to remain silent and refuse to answer any questions. Anything you say may be used against you in a court of law. You have the right to consult with an attorney at any time and have him present before and during questioning. If you cannot afford an attorney one will be provided if you so desire prior to any questioning. A decision *874 to waive these rights is not final and you may withdraw your waiver whenever you wish.
Detective Ribeiro then said to defendant, "[j]ust sign here that I read you your rights and 8/22/13 at 18:50 hours," and "[b]y signing [the Miranda card] you are not admitting you're guilty or anything [it's] just that I read you your rights." Without comment, defendant reviewed and signed the Miranda card.
Detective Ribeiro then explained that defendant had been arrested for possession of "several guns" now in police custody, and that the officers wanted to work "to keep you out of jail and ... for us to get guns off the street that's my goal." Defendant asked whether he would "get a bail or ... get released from here." Detective Ribeiro responded that "we're gonna work toward you getting a bail ok" and that "more than likely ... you will get bail," but cautioned that bail is set by a judge, not a police officer.
The conversation turned to the alleged transactions between defendant and the informant. Detective Ribeiro asked defendant about the first controlled purchase, conducted on February 12, 2013. Defendant contended that his role in that transaction was limited to connecting the cooperating informant with the owner of a gun that the informant had sought to purchase. In response to Detective Ribeiro's admonition that it was important for defendant **307 to offer a credible statement, defendant replied, "I'm going to jail regardless alright ... so what's the point[?]" The officers urged defendant to cooperate in their efforts to "get even more guns off the street," and defendant replied, "I know I can but uhhh it isn't make no point for me doing if I gotta go to jail."
In his questioning of defendant, Detective Ribeiro focused on identifying individuals who supplied, or offered to supply, the various weapons that defendant was alleged to have sold to, or discussed with, the informant. Defendant did not identify any supplier by name. The conversation between the detective and defendant rapidly shifted from transaction to transaction, and focused in part on a general discussion of weapons trafficking in Essex County. With the exception of defendant's alleged sale of a weapon to the informant on February 12, 2013, no transaction was identified by date in Detective Ribeiro's questions or in defendant's responses to those questions.[3]
During the interrogation, Detective Ribeiro raised the topic of a handgun sale at defendant's home -- an apparent reference to the April 3, 2013 transaction for which defendant was ultimately convicted. Defendant briefly discussed that transaction, focusing on the difficulty that he encountered paying the unidentified individual who supplied the weapon, and the modest profit that he made on the sale.
C.
Defendant was charged in an eight-count indictment. Two of the counts derived in part from defendant's alleged sale of the .38 caliber handgun on April 3, 2013: second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) ; and fourth-degree unlawful disposition of a weapon, N.J.S.A. 2C:39-9(d). The remaining six **308 counts related only to the four weapon transactions alleged to have taken place at the Newark grocery store. *875 The State moved before the trial court for the admission into evidence of defendant's statement to police. Defendant opposed the motion, arguing in part that, because he did not validly waive his Miranda rights, the court should suppress his entire statement.
Pursuant to N.J.R.E. 104(c), the trial court held a Miranda hearing. Detective Ribeiro, the sole witness at the hearing, described defendant's arrest, the setting of his interrogation, and the reading of defendant's Miranda rights. The detective testified that when defendant was questioned, he "appeared in good health," was "coherent," appeared to "understand his rights," and gave his statement voluntarily. Detective Ribeiro testified that he and Detective Holguin did not make promises to defendant, coerce him, or threaten him in order to secure his statement.
On cross-examination, Detective Ribeiro conceded that after reading each Miranda warning, he did not ask defendant to read the warning aloud or ask defendant whether he understood the warning. Detective Ribeiro also acknowledged that he had instructed defendant to sign the card as an indication that the detective had read defendant his rights.
At the N.J.R.E. 104(c) hearing, the trial court acknowledged that the Miranda card read to defendant included no inquiry regarding defendant's waiver. Nonetheless, it reasoned that waiver could be found "circumstantially by [defendant] continuing to answer and respond to questions." The court also cited defendant's comment that he was "going to jail regardless," viewing that remark to indicate that defendant understood he had the right to decide whether or not to answer the officers' questions. Conceding that it was unclear whether any of defendant's prior encounters with the criminal justice system involved the waiver of Miranda rights, the court generally relied on defendant's prior criminal record as evidence that he was "not unsophisticated in criminal investigations or interactions with police," thus underscoring the **309 defendant's appreciation of his right not to speak with the investigators.
The trial court found that the State had sustained its burden to prove beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his Miranda rights, and that there was no evidence that the statement was the product of coercion or duress. Accordingly, it held the statement admissible.
D.
The court conducted an eight-day jury trial. During the trial, defendant conveyed through his counsel that he did not recognize "the Constitution and the authority of the State of New Jersey to move forward with these charges against him." He declined to answer questions posed by the trial court.
The State presented the testimony of the informant and three investigators, as well as the transcripts of intercepted telephone calls, audio and video recordings relating to the controlled purchases, defendant's statement, and other evidence. Defendant did not testify and presented no evidence.
After four days of deliberations, the jury returned a verdict of guilty only as to the charges of **310 second-degree unlawful possession of a weapon, and fourth-degree unlawful disposition of a weapon, insofar as those charges related to a weapon identified on the verdict sheet as a "Smith & Wesson .38 Caliber." Accordingly, defendant was convicted only of charges relating to the April 3, 2013 controlled purchase by the informant, whom he met outside his home. The jury was unable to reach a verdict with respect to the charges of second-degree *876 unlawful possession of a weapon and fourth-degree unlawful disposition of a weapon as they related to other weapons, or the remaining six counts of the indictment.
E.
Pursuant to N.J.S.A. 2C:44-3(a), the State moved for the imposition of a discretionary extended term for defendant's conviction of second-degree unlawful possession of a weapon contrary to N.J.S.A. 2C:39-5(b). The trial court found defendant to be a persistent offender within the meaning of N.J.S.A. 2C:44-3(a). Relying on State v. Pierce, 188 N.J. 155, 169, 902 A.2d 1195 (2006), the court found that defendant was exposed to a sentencing range of five to twenty years' incarceration.
Citing United States v. Watts, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), and an unpublished Appellate Division decision, the State asked the trial court to consider defendant's conduct in connection with the charges on which the jury did not return a verdict -- charges that remained pending at the outset of the sentencing proceeding. Relying in part on Watts and the unpublished decision, the trial court determined that in sentencing defendant, it could rely on "reliable and trustworthy" evidence relevant to the charges on which the jury had deadlocked, as well as the charges of which he had been convicted. The court found that "the totality of th[e] evidence, the surveillance by the officers, the testimony of [the cooperating informant], [and] the acknowledgement by the defendant in his post-arrest statement[,] establishes clearly beyond a preponderance of the evidence ... the defendant's involvement in each and every one of those transactions."
The court applied aggravating factor three, N.J.S.A. 2C:44-1(a)(3), "[t]he risk that the defendant will commit another offense," based on defendant's juvenile adjudications, prior criminal convictions, and history of offending while on probationary status.[4] The **311 court observed that probationary supervision had not deterred defendant from criminal activity.
The court also applied aggravating factor six, N.J.S.A. 2C:44-1(a)(6), "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted," invoking the State's strong policy on gun control to protect the public; defendant's sales of firearms to the cooperating informant, an "unfit individual" with prior convictions; and the gravity of defendant's offenses.
The trial court also applied aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), "[t]he need for deterring the defendant and others from violating the law." In that regard, the court relied on defendant's failure to show remorse for any of his multiple weapon sales, finding that defendant had not acknowledged responsibility for any of the transactions for which he was charged. The court also relied on defendant's statement that he was not subject to the court's jurisdiction; it characterized defendant as *877 a "sovereign citizen."[5] Defendant disputed that characterization.
The court rejected defendant's request that it apply mitigating factor one, N.J.S.A. 2C:44-1(b)(1), "[t]he defendant's conduct neither caused nor threatened serious harm," again citing the importance of gun control, defendant's ineligibility to legally own weapons **312 by virtue of his criminal record, and defendant's sale of a weapon to the informant, who could not legally own that weapon.
Finally, the court declined to apply mitigating factor eight, N.J.S.A. 2C:44-1(b)(8), "[t]he defendant's conduct was the result of circumstances unlikely to recur." The court noted that defendant's request for that mitigating factor was based on a representation to his counsel that had not been explained on the record, and deemed it "virtually certain" that defendant would reoffend unless incarcerated.
The court sentenced defendant to an extended term of twenty years' incarceration, with ten years' parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6, on his conviction of second-degree unlawful possession of a weapon. For defendant's conviction of fourth-degree unlawful disposition of a weapon, the court sentenced defendant to a term of nine months' incarceration, to run concurrently with his twenty-year term of incarceration for the second-degree offense.
Immediately after the trial court sentenced defendant, the State moved to dismiss the counts of the indictment as to which the jury had been unable to reach a verdict. The trial court granted that motion.
F.
Defendant appealed his conviction and sentence. The Appellate Division affirmed the trial court's judgment.
The Appellate Division rejected defendant's argument that a defendant may waive Miranda rights only by an express statement. Applying the "totality of the circumstances" approach of prior case law to the question of waiver, the court held that the State had met its burden to prove beyond a reasonable doubt that defendant, understanding that he had a constitutional right not to speak to police, made a voluntary statement, and that the statement was not the product of coercion or duress.
**313 The Appellate Division also upheld defendant's sentence. It reasoned that in its application of aggravating and mitigating factors, the trial court did not rely exclusively on defendant's conduct in connection with the charges as to which the jury did not reach a verdict, but had considered other factors as well. It also noted that sentencing judges are permitted to consider material that would be inadmissible at trial as long as it is relevant and trustworthy.
We granted defendant's petition for certification. 232 N.J. 92, 178 A.3d 64 (2018). We also granted the application of the American Civil Liberties Union of New *878 Jersey (ACLU) to appear as amicus curiae.
II.
A.
Defendant argues that the State failed to prove beyond a reasonable doubt that he waived his Miranda rights before giving his statement. He contends that under New Jersey law, a defendant should not be deemed to have waived his or her Miranda rights absent an express waiver. Defendant asserts that his sentence was manifestly excessive because the trial court improperly considered conduct relating to the charges as to which the jury was deadlocked, thus denying defendant the presumption of innocence. He claims that the trial court attempted to reverse what it considered an unjust verdict contrary to the Appellate Division's holding in State v. Tindell, 417 N.J. Super. 530, 556, 10 A.3d 1203 (App. Div. 2011).
B.
The State urges the Court to reaffirm New Jersey's adherence to a "totality of the circumstances" test for a Miranda waiver which allows for a finding of implied waiver. It asserts that it met its burden to prove beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his Miranda **314 rights. Alternatively, the State argues that any error in the admission of defendant's statement was harmless beyond a reasonable doubt. The State contends that the trial court properly exercised its discretion in sentencing defendant within the statutory range for an extended term and that it was not error for the court to consider all of the evidence of defendant's conduct when it weighed the aggravating and mitigating factors.
C.
The ACLU, limiting its argument to the sentencing issue, contends that a court's reliance on charges as to which a jury deadlocked violates the New Jersey Constitution, even if such reliance comports with federal law. The ACLU also asserts that the trial court improperly relied on defendant's denial of the charges as evidence of a lack of remorse, and on his alleged status as a "sovereign citizen," which defendant denies.
III.
A.
We review the trial court's factual findings as to defendant's Miranda waiver in accordance with a deferential standard. We consider whether those findings are "supported by sufficient credible evidence in the record." State v. S.S., 229 N.J. 360, 374, 162 A.3d 1058 (2017) (quoting State v. Gamble, 218 N.J. 412, 424, 95 A.3d 188 (2014) ). "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.' " State v. A.M., 237 N.J. 384, 395, 205 A.3d 213 (2019) (quoting State v. Elders, 192 N.J. 224, 244, 927 A.2d 1250 (2007) ). That standard governs appellate review even when the trial court's findings are premised on a recording or documentary evidence that the appellate court may also review. S.S., 229 N.J. at 380-81, 162 A.3d 1058. To the extent that a trial court determination involved legal conclusions, we review those conclusions de novo. A.M., 237 N.J. at 396, 205 A.3d 213.
**315 B.
This appeal implicates the right against self-incrimination, "guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, *879 now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. Nyhammer, 197 N.J. 383, 399, 963 A.2d 316 (2009).
In Miranda, the United States Supreme Court held that before law enforcement subjects a suspect to custodial interrogation, the suspect must be advised: (1) "that he has the right to remain silent"; (2) "that anything he says can be used against him in a court of law"; (3) "that he has the right to the presence of an attorney"; and (4) "that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479, 86 S.Ct. 1602. Miranda imposes a fifth requirement: "that a person must be told that he can exercise his rights at any time during the interrogation." Ibid.
The Miranda warnings ensure "that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." A.M., 237 N.J. at 397, 205 A.3d 213. As we have observed, "[t]he essential purpose of Miranda is to empower a person -- subject to custodial interrogation within a police-dominated atmosphere -- with knowledge of his basic constitutional rights so that he can exercise, according to his free will, the right against self-incrimination or waive that right and answer questions." Nyhammer, 197 N.J. at 406, 963 A.2d 316 (citing Miranda, 384 U.S. at 456-57, 86 S.Ct. 1602 ).
When the Supreme Court defined a suspect's rights during custodial interrogation in Miranda, it also addressed the waiver of those rights; it held that "[t]he defendant may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444, 86 S.Ct. 1602. Under federal Fifth Amendment law, the government must prove by a preponderance of the evidence that the suspect's waiver was made voluntarily, knowingly, and intelligently.
**316 Missouri v. Seibert, 542 U.S. 600, 608 n.1, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) ; State v. O'Neill, 193 N.J. 148, 168 n.12, 936 A.2d 438 (2007). New Jersey law holds the State to a standard of proof more stringent than that imposed by federal Fifth Amendment law; the State must "prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." State v. Presha, 163 N.J. 304, 313, 748 A.2d 1108 (2000) ; see also A.M., 237 N.J. at 397, 205 A.3d 213 ; Nyhammer, 197 N.J. at 401 & n.9, 963 A.2d 316.
Our law, however, does not require that a defendant's Miranda waiver be explicitly stated in order to be effective. "A waiver may be 'established even absent formal or express statements.' " A.M., 237 N.J. at 397, 205 A.3d 213 (quoting Berghuis v. Thompkins, 560 U.S. 370, 383, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) ). Indeed, "[a]ny clear manifestation of a desire to waive is sufficient." Ibid. (alteration in original) (quoting State v. Hartley, 103 N.J. 252, 313, 511 A.2d 80 (1986) ); see also State v. Kremens, 52 N.J. 303, 311, 245 A.2d 313 (1968) ; Kevin G. Byrnes, N.J. Arrest, Search & Seizure § 28:2-1 (2019) (noting that under New Jersey law, "a waiver may be inferred from the particular factual circumstances following the proper administration of Miranda warnings to a suspect in custody").
To determine the question of waiver, the trial court reviews "the totality of the circumstances surrounding the custodial interrogation." A.M., 237 N.J. at 398, 205 A.3d 213. "The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances." Kremens, 52 N.J. at 311, 245 A.2d 313. "Where the *880 prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis, 560 U.S. at 384, 130 S.Ct. 2250.
There is substantial overlap between the factors that govern a court's determination of whether a Miranda waiver is **317 valid and the factors that a court considers in its separate assessment of the voluntariness of a confession. See Colorado v. Connelly, 479 U.S. 157, 169-70, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (finding "no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context" and explaining that "[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion"). In the inquiry as to the validity of a waiver, "[f]actors commonly considered include the suspect's intelligence and education, age, familiarity with the criminal justice system, physical and mental condition, and drug and alcohol problems." 46 Geo. L.J. Ann. Rev. Crim. Proc. 3, 230-33 (2017) (footnotes omitted); see also A.M., 237 N.J. at 398, 205 A.3d 213 (citing the suspect's age, education and intelligence among factors to be considered in the waiver inquiry). In addition, courts consider "the explicitness of the waiver, language barriers, and the time lapse between the reading of Miranda rights and the actual questioning or incriminating oral statement." 46 Geo. L.J. Ann. Rev. Crim. Proc. at 233-34 (footnotes omitted). Courts may take into account other factors that are pertinent to a given case.
C.
Guided by those principles, we review the trial court's finding that the State met its burden to prove beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his Miranda rights.
As noted above, see supra Section I.C., at the N.J.R.E. 104(c) hearing, the court found that a number of factors supported the State's argument that defendant implicitly waived his Miranda rights. The court cited defendant's continuing response to questions, his comment that he was "going to jail regardless," and his criminal record.
Other factors not cited by the trial court also support a finding of implied waiver in this case. Defendant was twenty-eight years old at the time of the interrogation. Although he was not a high **318 school graduate, defendant spoke fluently and assertively, confidently challenging some of Detective Ribeiro's comments. When he spoke with the State Police investigators, defendant had been detained at the Metro North Station for only about twenty minutes. Moreover, only five minutes elapsed between the administration of the Miranda warnings and defendant's first substantive response to a question. In short, we agree with the trial court that the majority of the factors typically considered in the "totality of the circumstances" inquiry favor a finding of implied waiver.
The trial court, however, did not consider two aspects of the administration of the Miranda warnings in this case. First, the Miranda card used by the New Jersey State Police investigators does not reflect optimal law-enforcement practice. The card accurately recited a suspect's Miranda rights, and mentioned the waiver of Miranda rights in a sentence advising a suspect that his or her decision to waive those rights is not final and may be withdrawn. It did not guide an interrogating officer, however, to ensure that the suspect had waived those rights before questioning began. Instead, the card ambiguously stated *881 that by signing, the suspect acknowledged that he or she had been "advised of the constitutional rights found on the reverse side of this card." In short, the Miranda card used in this case invited an incomplete inquiry on the question of waiver.
Consistent with Fifth Amendment jurisprudence and state law on the right against self-incrimination, Miranda cards and other written forms used by law enforcement in New Jersey should direct the interrogating officer to address the question of waiver in the Miranda inquiry. Miranda waiver cards and forms should guide an officer to ask whether the suspect understands his or her rights, and whether, understanding those rights, he or she is willing to answer questions. We request that the Attorney General review examples of Miranda waiver cards and forms in use by law-enforcement agencies in New Jersey, and make recommendations as to best practices on this issue.
**319 Second, the advice that Detective Ribeiro gave defendant as to the purpose of his signature on the Miranda card was incomplete. Perhaps misled by the language of the Miranda card, the detective told defendant that by signing the card, he would simply acknowledge that his Miranda rights had been read to him. He urged defendant to "[j]ust sign here that I read you your rights."
To the contrary, a defendant's signature on a Miranda card does much more than acknowledge that law enforcement has recited the Miranda rights. When law enforcement officers request that a suspect sign a Miranda card or form, they should scrupulously avoid making comments that minimize the significance of the suspect's signature on that card or form.
Accordingly, although most of the "totality of the circumstances" factors support the trial court's finding of an implied waiver, the advice that law enforcement gave defendant regarding his constitutional rights weighs against such a finding in this case.
D.
To decide this appeal, we need not resolve the difficult question whether the trial court's decision admitting into evidence defendant's statement to police was "so clearly mistaken -- so wide of the mark -- that the interests of justice demand intervention." S.S., 229 N.J. at 381, 162 A.3d 1058. We conclude that, in the unusual setting of this case, any error by the trial court in admitting defendant's statement was harmless beyond a reasonable doubt. See R. 2:10-2 (stating the general standard for appellate review of alleged error); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (expounding the "harmless beyond a reasonable doubt" standard for cases implicating constitutional error); see also State v. Maltese, 222 N.J. 525, 550, 120 A.3d 197 (2015) (applying the "harmless beyond a reasonable doubt" standard to the defendant's assertion that police officers violated his Miranda rights in his interrogation).
The evidence implicating defendant in the single weapon transaction for which he was convicted -- the April 3, 2013 sale of a .38 **320 caliber handgun to the informant -- was overwhelming. The cooperating informant testified that he spoke with defendant by telephone to arrange the purchase of a .38 caliber handgun at defendant's home in Union. He stated that he was familiar with defendant's home because he had been there before to attend a party and to see defendant. According to Detective Ribeiro, before the informant proceeded to defendant's home to buy the gun, the informant met with Detective Ribeiro, who searched him for contraband, provided him *882 with money to purchase the weapon, and outfitted him with a recording device. The detective stated that he followed the informant to defendant's home.
In contrast to the four transactions that allegedly took place inside the Newark grocery store with no officers present, the April 3, 2013 transaction was conducted in a vehicle under visual surveillance by one of the investigating officers. Detective Greener, located "in very close proximity" to defendant's home, testified that he observed the informant arrive by car at the residence. He stated that he then saw defendant, whom he recognized from a photograph, leave his home carrying a black plastic bag. Detective Greener watched as defendant entered the informant's car through the passenger door. According to Detective Greener, after spending four or five minutes with the informant in the vehicle, defendant "exited and went back into ... his front door," carrying nothing.
The recording device, which functioned effectively during the April 3, 2013 transaction, memorialized an incriminating conversation between defendant and the informant. Defendant told the informant that he was "sticking my neck out for you," and that he did not have the money for the transaction. He complained to the informant, "I could see if I was making something," and characterized an unidentified individual as "greedy as hell." The informant also complained about the financial terms of the transaction; he told defendant that "this is killing me ... I'm mak[ing] a little bit of money but dam[n] bro what is it anyway." Defendant replied, "three eight." The informant replied, "[t]hree eight is loaded ah **321 shit I ain't touching that shit fuck." Defendant warned the informant that the weapon was not only loaded but cocked, and when the informant asked why it was cocked, defendant said, "I don't know." The informant verified the accuracy of the recording, and Detective Ribeiro testified that the voices on the recording were the voices of defendant and the informant.
At trial, the informant identified the weapon that he purchased from defendant on April 3, 2013, and testified that when he bought the weapon from defendant, it was "loaded and ready to shoot." He also identified for the jury the container in which defendant delivered the handgun to him.
In addition to Detective Greener's testimony, discussed earlier, Detective Ribeiro testified that he followed the informant as he drove from defendant's residence to a predetermined location, that the informant made no stops along the way, and that he met with the informant at the location. He stated that he recovered from the informant's vehicle a black plastic bag. From the bag, Detective Ribeiro retrieved a "white foam container," and found in that container a loaded .38 caliber revolver.
The State thus presented compelling proof of defendant's April 3, 2013 sale of a handgun that was independent of any admission by defendant in his statement to police. The testimony of the cooperating informant, the testimony of the officers, the recorded conversation, and the physical evidence gave the jury a detailed account of the sole controlled purchase that led to a conviction in this case.
In contrast to that clear evidence, defendant's statement to police contained little -- if any -- incriminating evidence relevant to the April 3, 2013 transaction. To the extent that Detective Ribeiro and defendant appeared to discuss that transaction, the focus of their conversation was on a problem defendant encountered in paying the supplier of the weapon.
Detective Ribeiro stated, "[n]ow let me ask you this ... I'm a little unclear about *883 this like this one was at your house." Defendant **322 answered, "[u]m hum." Detective Ribeiro asked whether defendant "had to front the money initially to this guy," which defendant affirmed without identifying the "guy" being discussed. Defendant stated that the money "wasn[']t my money it was the store's money but I had to put it right back so I made a hundred dollars." He said that he had to "front" nine hundred dollars. Defendant indicated that he carried the weapon in a cab, and said that an unidentified "dude" accompanied him on the cab ride, because defendant was short two hundred dollars and had to retrieve money from his home. Defendant said that he had charged the cooperating informant one thousand dollars and "just made a hundred" after he returned the money he had taken "from the store."
In what may also be a reference to the same transaction, Detective Ribeiro later commented, "you also have one that ... was a thirty eight it's like a chrome gun with tape around the handle." Defendant responded, "[f]rom a dude up the street this time for 18th Ave," and said it was a "different guy." The detective and defendant then discussed the description of the unnamed "dude" and "guy."
Those oblique exchanges stand in stark contrast to the clear and comprehensible timeline of that transaction presented at trial through the testimony of the State's witnesses and the recorded conversations between the informant and defendant. In defendant's statement, neither Detective Ribeiro nor defendant revealed the date of the weapon sale that they discussed. Indeed, their comments were untethered to any identifying information, other than the location of what the detective called "this one" at defendant's home.
The statement could do little to advance the State's otherwise comprehensive case against defendant regarding the April 3, 2013 sale of a handgun. When the evidence is viewed in its entirety, it is extremely unlikely that defendant's statement had an impact on the jury's determination on the single transaction relevant to this appeal.
**323 Accordingly, we hold that the State has proven beyond a reasonable doubt that if the admission of defendant's statement constituted error, that error was harmless. We therefore concur with the Appellate Division's judgment affirming defendant's conviction.
IV.
A.
We next review defendant's contention that his sentence was excessive. In that inquiry, we "must not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70, 85 A.3d 923 (2014). We affirm a trial court's sentencing determination unless: "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found ... were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.' " Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65, 471 A.2d 370 (1984) ). As this Court has stated, "[t]he critical focus of the appellate power to review and correct sentences is on whether the basic sentencing determination of the lower court was 'clearly mistaken.' " State v. Jarbath, 114 N.J. 394, 401, 555 A.2d 559 (1989).
B.
When, as here, the State requests that a court sentence a defendant to a discretionary extended term, the court must decline that request "unless the ground therefor has been established at a hearing after the conviction of the defendant and on written notice to the defendant *884 of the ground proposed." N.J.S.A. 2C:43-7.1(d). The court's first task is to "review and determine whether [a defendant's] criminal record of convictions renders him ... statutorily eligible" for an extended term. **324 Pierce, 188 N.J. at 168, 902 A.2d 1195.[6] To be eligible for a discretionary extended term, a defendant must be:
a person who at the time of the commission of the crime is 21 years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least 18 years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within 10 years of the date of the crime for which the defendant is being sentenced.
[ N.J.S.A. 2C:44-3(a).]
"[O]nce the court finds that [the] statutory eligibility requirements are met, ... the range of sentences, available for imposition, starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range." Pierce, 188 N.J. at 169, 902 A.2d 1195. As we noted in Pierce,
[w]here, within that range of sentences, the court chooses to sentence a defendant remains in the sound judgment of the court -- subject to reasonableness and the existence of credible evidence in the record to support the court's finding of aggravating and mitigating factors and the court's weighing and balancing of those factors found.
[ Ibid. ]
**325 When a court weighs aggravating and mitigating factors, the judge exercises "a far-ranging discretion as to the sources and types of evidence used to assist him or her in determining the kind and extent of punishment to be imposed." State v. Davis, 96 N.J. 611, 619-20, 477 A.2d 308 (1984). The court is not limited by the rules of evidence, see N.J.R.E. 101(a)(2)(C), and "evaluates 'a range of information unconstrained by evidential considerations,' " Fuentes, 217 N.J. at 72, 85 A.3d 923 (quoting State v. Randolph, 210 N.J. 330, 348, 44 A.3d 1113 (2012) ). However, "[t]he finding of any factor must be supported by competent, credible evidence in the record." State v. Case, 220 N.J. 49, 64, 103 A.3d 237 (2014).
C.
1.
The parties agree that defendant qualified as a "persistent offender" for purposes *885 of N.J.S.A. 2C:44-3(a) ; accordingly, he was statutorily eligible for a discretionary extended term. As defendant concedes, his twenty-year extended-term sentence is within the range between the five-year minimum of the ordinary-term range for a second-degree offense, N.J.S.A. 2C:43-6(a)(2), and the twenty-year maximum of the extended-term range for that offense, N.J.S.A. 2C:43-7(a)(3). Accordingly, the trial court's eligibility determination is not before the Court in this appeal.
Rather, defendant bases the appeal of his sentence on the trial court's application of aggravating factors three, six, and nine to reach the upper end of that sentencing range. He challenges the court's consideration of those factors in two respects. First, defendant asserts that the court improperly cited his conduct relating to charges on which the jury deadlocked because it sought to reverse what it considered an unjust verdict, thus adjudicating him guilty of offenses as to which the jury did not convict him. Second, defendant objects to the court's "duplicative" reliance on his criminal record both to deem him statutorily eligible for an **326 extended term and to find aggravating factors six and nine. We consider each contention in turn.
2.
When a judge presides over a jury trial regarding multiple offenses, he or she has the opportunity to evaluate the credibility of witnesses and to assess the evidence presented as to each of those offenses. If a jury is unable to return a verdict as to some offenses and convicts the defendant of others, and the State requests that the court consider evidence presented as to offenses on which the jury deadlocked, such information may constitute competent, credible evidence on which the court may rely in assessing the aggravating and mitigating factors. See Case, 220 N.J. at 63-65, 103 A.3d 237. No Sixth Amendment or other constitutional principle, or statutory provision, generally bars a court from considering such evidence. And consideration of competent evidence presented in support of charges -- even if the jury does not go on to convict defendant on those charges -- does not raise concerns about drawing inferences from the mere fact that charges had been brought, a practice we found improper in State v. K.S., 220 N.J. 190, 104 A.3d 258 (2015).
Nevertheless, we have two concerns about the court's reliance on evidence pertaining to the four transactions as to which the jury deadlocked in this appeal.[7] First, the charges relating to those four transactions were still pending when the court sentenced defendant and were not dismissed until the end of the hearing, moments after the court imposed the sentence. The record does not reveal whether the State had advised the court and defense counsel that it would move to dismiss the remaining charges immediately after sentencing. The trial court should have denied the State's request to consider evidence relevant to those **327 charges, and should not have opined about the defendant's guilt with respect to those charges, while the charges remained pending. We caution courts not to consider evidence pertaining to charges as to which a jury deadlocked in sentencing unless and until the defendant no longer faces the prospect of prosecution for those charges. *886 Second, the trial court's reliance on Watts was misplaced. In Watts, which involved a sentencing court's reliance on evidence presented as to a charge on which the defendant was acquitted, the United States Supreme Court did not confront the deadlocked-jury issue raised by this case.
We concur, however, with the Appellate Division's view that the evidence pertaining to charges on which the jury deadlocked was not dispositive in defendant's sentencing. Indeed, when it found aggravating factor three, the trial court did not refer at all to those charges. When the court found aggravating factors six and nine, it emphasized other factors such as defendant's prior record, the failure of prior probationary sentences to deter defendant, the serious nature of the offenses of which defendant was convicted, and the State's strong policy to protect the public with strict gun control laws.
Although the trial court should have declined to consider defendant's conduct in the charges that did not lead to a conviction unless the State moved to dismiss those charges prior to the imposition of sentence, the court's reliance on such conduct as one of several factors supporting two of the three aggravating factors does not warrant resentencing.
3.
We find no error in the trial court's reliance on defendant's criminal record both to determine defendant's "persistent offender" status under N.J.S.A. 2C:44-3(a) and to support the court's finding of aggravating factors three, six, and nine. Indeed, in our decision in Pierce, we envisioned that the defendant's **328 criminal record may be relevant in both stages of the sentencing determination. We held that "[a] sentencing court must first, on application for discretionary enhanced-term sentencing under N.J.S.A. 2C:44-3(a), review and determine whether a defendant's criminal record of convictions renders him or her statutorily eligible." 188 N.J. at 168, 902 A.2d 1195. If so, "whether the court chooses to use the full range of sentences opened up to the court is a function of the court's assessment of the aggravating and mitigating factors, including the consideration of the deterrent need to protect the public." Ibid. In that crucial inquiry, defendant's prior record is central to aggravating factor six, N.J.S.A. 2C:44-1(a)(6), and may be relevant to other aggravating and mitigating factors as well. See N.J.S.A. 2C:44-1(a) and (b) ; see also State v. McDuffie, 450 N.J. Super. 554, 576-77, 164 A.3d 414 (App. Div. 2017) (rejecting, "as lacking merit," the defendant's claim that the sentencing court "impermissibly double-counted his criminal record, when granting the State's motion for a discretionary extended term, and again, when imposing aggravating factor six, which considers the extent and seriousness of a defendant's prior record").[8]
Accordingly, the trial court properly considered defendant's criminal record in deciding defendant's statutory eligibility for an extended term, and in weighing aggravating and mitigating factors to determine that such a term was warranted.
V.
The judgment of the Appellate Division is affirmed as modified.
JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PATTERSON'S opinion. CHIEF JUSTICE RABNER filed an opinion concurring in part and dissenting in part, in which JUSTICE TIMPONE joins. JUSTICE ALBIN filed a dissenting opinion.

During the informant's testimony about the April 3, 2013 transaction, the jury was informed that he had faced two pending criminal charges and received more favorable treatment in connection with those charges because of his cooperation in the investigation of defendant.

Detective Ribeiro later testified that the Metro North Station's interview facilities lacked video-recording capability.

The audio-recording of the interview suggests that Detective Ribeiro showed defendant various weapons during the interview. The detective, however, did not identify each weapon as he showed it to defendant, so it is unclear what weapon is being discussed at each stage of the questioning.

According to defendant's Presentence Report, between May 2002 and September 2002, defendant, then a juvenile, was adjudicated delinquent for conduct on two occasions that, if committed by an adult, would constitute theft by unlawful taking and for improper behavior. In February 2003, defendant was adjudicated delinquent for conduct that, if committed by an adult, would constitute resisting arrest, and was sentenced to a two-year term of incarceration. He also had a record of adult convictions. In October 2005, in accordance with a plea agreement, defendant pled guilty in a Virginia court to several counts of grand larceny and was sentenced to ten years' incarceration in Virginia. Lastly, in April 2012, defendant was sentenced to a two-year term of probation for possession of a controlled dangerous substance.

See United States v. Weast, 811 F.3d 743, 746 n.5 (5th Cir. 2016) ("The sovereign citizen movement is a loose grouping of litigants, commentators, and tax protesters who often take the position that they are not subject to state or federal statutes and proceedings."); United States v. Brown, 669 F.3d 10, 18 n.12 (1st Cir. 2012) (observing that members of the sovereign citizen movement "reject most forms of taxation as illegitimate[ ] and place special significance in commercial law"). The court later supplemented the sentencing record with a document identified as a letter written by defendant to another judge in the same vicinage, in which defendant objected to being "adjudicated under this commercial law jurisdiction" and claimed a "divine and inalienable right as a one-man sovereign nation."

Prior to our decision in Pierce, sentencing courts were required to "examine whether, in order to protect the public, imposition of an extended sentence [was] necessary" to determine a defendant's eligibility for a discretionary extended term." 188 N.J. at 164, 902 A.2d 1195 (citing State v. Dunbar, 108 N.J. 80, 90-91, 527 A.2d 1346 (1987) ). In response to a challenge to that practice as a violation of the defendant's Sixth Amendment right to a jury trial under the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), we held that a determination as to the need to protect the public should not be made until the court has determined the defendant to be statutorily eligible for "a sentence up to the maximum of the discretionary extended-term range based on statutory eligibility as a persistent offender." Pierce, 188 N.J. at 158, 167-68, 902 A.2d 1195. Limited to a role in the court's application of aggravating and mitigating factors after the defendant has been found eligible for an extended term, the court's factfinding as to public safety does not offend the Sixth Amendment. See ibid. Indeed, as we recently noted in a sentencing appeal involving judicial factfinding to set a period of parole ineligibility, "[r]equiring the finding of aggravating factors to justify a sentence within the prescribed range does not transform those factors into the substantial equivalent of elements of an offense to be decided by a jury." State v. Kiriakakis, 235 N.J. 420, 437, 196 A.3d 563 (2018).

There is no indication in the trial or sentencing record that the trial court considered the jury's verdict to be unjust, or otherwise demonstrated a lack of respect for its determination. Accordingly, the Appellate Division's decision in Tindell, 417 N.J. Super. at 556, 10 A.3d 1203, is inapposite.

We do not reach the ACLU's contention that the trial court improperly considered defendant's lack of remorse or his "sovereign citizen" status, as defendant did not raise those arguments. See State v. J.R., 227 N.J. 393, 421, 152 A.3d 180 (2017) ("This Court does not consider arguments that have not been asserted by a party, and are raised for the first time by an amicus curiae.").