**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3748-20

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

PIERRE C. DUTAILLY,

    Defendant-Respondent.

_____

Argued January 12, 2022 – Decided January 31, 2022

Before Judges Hoffman and Geiger.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Union County, Indictment No. 21-01-0005.

Milton S. Leibowitz, Assistant Prosecutor, argued the cause for appellant (William A. Daniel, Union County Prosecutor, attorney; Milton S. Leibowitz, on the brief).

Peter T. Blum, Assistant Deputy Public Defender argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Peter T. Blum, of counsel and on the brief).

PER CURIAM

In this interlocutory appeal, the State appeals from the Law Division's order granting defendant Pierre C. Dutailly's motion to suppress the warrantless seizure of physical evidence from his person after defendant was detained following a verbal argument that occurred near his home. We affirm.

We glean the following facts from the motion record. On May 18, 2020, at approximately 1:30 a.m., Elizabeth Police Officer Gabriel Pereira was dispatched to "a male and a female dispute." The computer aided dispatch (CAD) report in the officer's patrol vehicle indicated a "[l]andlord report[ed] that the 'tenant was arguing with her grandson.'" Pereira later learned that defendant's grandmother, who was also his landlord, called 911. Neither the CAD report nor the radio dispatch indicated any concern for domestic violence.

Pereira had worked as an Elizabeth Police Department officer for less than two years and was wearing a body camera. At the suppression hearing, the judge watched the body camera footage.

Pereira, who was driving a marked patrol vehicle, parked in front of the home, exited his vehicle, and then heard arguing. As he approached the house, he realized the argument was taking place on the other side of a chain link fence on an adjacent property. Pereira testified the dispute "sounded angry" but he could not make out what was being said. When he observed the male and female

from the driveway, he did not see any physical assault, any indication of criminal activity, or any indication that either party had a weapon. He listened without making his presence known and returned to his patrol vehicle.

Pereira testified that it was his job "to find out what the situation was" and "what's going on, whether the person was assaulted, whether it was just an argument, [and] whether the female or male in that situation wanted a restraining order . . . ." Pereira testified that for officer safety, he wanted to go around to the other side to "speak to them person-to-person."

While walking to his patrol vehicle, Pereira was met by Officer Julio Jimenez and explained the parties were on the other side of the fence. Pereira testified he "wanted to speak to both parties and make sure that nothing had happened. And, if that was the case, both parties would be able to just go home." The officers "pulled around" and "entered the parking lot" for the address where the argument was taking place "from the far side, away from the two parties[,]" who then both began walking towards the fence. Pereira did not turn on the headlights or emergency lights, and did not use the siren because he "didn't want these two people to know [he] was pulling up." Pereira testified that with his windows down, he commanded the suspect to: "Stop," "Don't jump the fence," but the suspect he continued to move toward the fence. Pereira did not use the

3

patrol vehicle's speaker system when issuing those commands. That is when Pereira exited his vehicle and approached defendant.

When the patrol vehicles pulled up, defendant began "walking, running towards the fence" and jumped the fence as the officer exited his vehicle. The timeline of defendant's jump over the fence is unclear. In the video, Pereira stated that as soon as he pulled up, he saw defendant jump the fence. Pereira acknowledged that "from the point [he] got out of the car to the point [he] reached the fence [he] never repeated . . . 'Don't jump the fence[.]'" Pereira never identified himself as a police officer, and his patrol vehicle's headlights remained off. Pereira quickly exited his vehicle, ran between the two patrol vehicles, jumped over the fence, shouted "[s]tay still," and immediately grabbed defendant who was heading toward the house. Pereira stated that defendant began "reaching his hands into his waistband or pockets in front of him" and was told by the officers to show his hands. Pereira observed a silver revolver and after alerting Jimenez, wrapped his arms around defendant. Pereira testified that as he was taking defendant "to the ground," defendant "had the chance to release the weapon, and . . . toss it." When Pereira saw the gun, defendant had it "in front of him in his right hand, he was holding it. Not in a manner where

4

he could shoot it, but he was holding it[.]" Defendant was then handcuffed and arrested.

A Union County grand jury returned an indictment charging defendant with second-degree unlawful possession of a handgun without a carry permit, N.J.S.A. 2C:39-5(b)(1), and fourth-degree possession of prohibited ammunition (hollow nose bullets), N.J.S.A. 2C:39-3(f)(1).

Defendant moved to suppress the handgun seized by police during the encounter on grounds that the stop and search by police was unconstitutional. At oral argument, the State took the position "that under the totality of the circumstances, Officer Pereira indicated that he had a reasonable and articulable suspicion [] to believe that a crime could have occurred, [namely] a potential act of domestic violence." In the alternative, the State argued that Pereira properly stopped defendant based on defendant's flight, which constituted obstruction. More specifically, the State asserted Pereira had a reasonable suspicion to believe defendant was engaged in a dispute, potentially of a domestically violent nature, and this permitted the officer to stop and question defendant.

The State contended defendant obstructed when he did not stop, which gave rise to probable cause for officers to pursue and arrest him. In the alternative, the State argued that the gun discarded by defendant was admissible

based on the doctrine of attenuation. The State claimed that defendant's flight from Pereira "broke the causal link between the unjustified, warrantless stop and defendant's decision to discard his weapon."

The State further argued that the handgun was properly seized under the plain view exception to the warrant requirement because before defendant was placed under arrest, he "withdrew a firearm from his pocket" that Pereira observed while the officer was "lawfully in the viewing area" and the handgun was "evidence of a crime, contraband, or otherwise subject to seizure." Finally, the State claimed the gun was admissible because it was abandoned when defendant discarded it while officers attempted to make a lawful arrest.

In response, defendant asserted that while Pereira had grounds to conduct a field inquiry and speak to anyone who remained in the area to speak to him by choice, he did not have a lawful basis to detain defendant. Defendant argued there was no objectively reasonable suspicion to justify the officer's stop since there was no crime, no physical altercation, and no weapons were observed. Defendant further argued that the officers intentionally created a situation to "surprise" defendant, the State did not prove defendant heard the officer's warning to not the jump the fence, and the officer did not announce himself before apprehending defendant. Defendant emphasized the short interval

6

between the officer's commands to stop and him grabbing defendant. He also argued that even if he obstructed the police, the obstruction "was too trivial to 'break the causal link' between the illegal stop and the discovery of the gun."

Judge Regina Caulfield granted defendant's motion to suppress the handgun and memorialized her findings in a fourteen-page written decision. The judge found "Pereira was a credible witness despite several inconsistencies during his testimony, and between his testimony and what his [body camera] recording indicated." For example, Pereira initially testified he kept his headlights off on purpose but later stated he had forgotten to turn them on.

The judge differentiated between a field inquiry and an investigatory stop and acknowledged that police are obligated to investigate suspicious behavior. Regarding obstruction, the judge explained:

> While members of the public are permitted to walk away from a simple field inquiry, fleeing an officer during a Terry stop constitutes obstruction . . . regardless of the constitutionality of the stop. State v. Crawley, 187 N.J. 440, 460 (2006). During a Terry stop, "members of the public [are] to submit to a police officer's show of authority, not to look for an exit. Case law tells people to obey words and deeds of law enforcement that communicate demands for directed behavior and to raise constitutional objections thereafter." State v. Rosario, 229 N.J. 263, 274-75 (2017).

7

The judge distinguished Pereira's actions from the situation in Crawley. She noted that Pereira was "not dispatched . . . to investigate criminal or even suspicious activity." The judge found that Pereira attempted to conduct a Terry[1] stop when he yelled to defendant from his moving patrol vehicle and had defendant heard Pereira, defendant would not have been free to flee and instead would have had to obey his command. However, Pereira's "attempt to stop defendant was not justified as it was not based upon reasonable, articulable suspicion that defendant had committed, or was committing a criminal act . . . . [O]ur courts have recognized that 'flight alone does not create reasonable suspicion for a stop.'" (quoting State v. Dangerfield, 171 N.J. 446, 457 (2002)). The court found that Pereira's attempted Terry stop was not justified as the testimony clearly demonstrated that the male and female were merely having an argument.

The judge next addressed the seizure of defendant's handgun. In explaining the bounds of the exclusionary rule, the court highlighted the three factors that must be considered under Brown v. Illinois, 422 U.S. 590, 593-94 (1975). She stated that a court must consider "'temporal proximity' between the illegal conduct and the challenged evidence, the 'presence of intervening

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

A-3748-20

circumstances' and, in particular, the 'purpose and flagrancy of the official misconduct.'" (quoting State ex rel. J.A., 233 N.J. 432, 447 (2018)). The judge found there was "no significant break in the causative chain between Pereira's attempt to conduct an unlawful Terry stop and defendant allegedly dropping a gun . . . . [T]he State has not shown that defendant was aware that he was fleeing from a police officer, or that defendant even heard the officer's command to stop." The judge found the situation lacked an "intervening act that marked 'the point at which the detrimental consequences' of the illegal police action became so 'attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost.'" (quoting State v. Williams, 192 N.J. 1, 16 (2007)).

Based on those findings, Judge Caulfield issued an order and written decision granting defendant's motion to suppress the handgun. We granted the State's motion for leave to appeal from that order.

Defendant raises a single point for our consideration:

> THE TRIAL COURT ERRONEOUSLY GRANTED DEFENDANT'S MOTION TO SUPPRESS AND ITS ORDER SUPPRESSING THE GUN THAT WAS SEIZED AFTER DEFENDANT FLED FROM A LAWFUL INVESTIGATORY DETENTION MUST BE REVERSED.

Our scope of review of a suppression decision is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). We uphold a trial court's factual findings made in

connection with a motion to suppress when "those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We defer to a trial court's factual findings because they are "informed by [the court's] first-hand assessment of the credibility of the witnesses . . . ." State v. Lentz, 463 N.J. Super. 54, 67 (App. Div. 2020). "[A] trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court," State v. S.S., 229 N.J. 360, 374 (2017), but rather only if the findings are "so clearly mistaken that the interests of justice demand intervention and correction," State v. Gamble, 218 N.J. 412, 425 (2014) (quoting Elders, 192 N.J. at 244). "That standard governs appellate review even when the trial court's findings are premised on a recording or documentary evidence that the appellate court may also review." State v. Tillery, 238 N.J. 293, 314 (2019) (citing S.S., 229 N.J. at 380-81). However, we review a trial court's legal conclusions de novo. Ahmad, 246 N.J. at 609.

The Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution generally require police to obtain "a warrant based on probable cause . . . prior to any search or seizure." State v. Harris, 211 N.J. 566, 581 (2012). As such, warrantless searches and seizures

10

are presumptively unreasonable and invalid. State v. Chisum, 236 N.J. 530, 545 (2019). The State must prove the search or seizure fell within one of the few recognized exceptions to the warrant requirement. Ibid.

A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." Terry, 392 U.S. at 16. An exception to the warrant requirement is an investigatory stop, also known as a Terry stop, Rosario, 229 N.J. at 272, which allows police to "detain an individual temporarily for questioning," State v. Maryland, 167 N.J. 471, 486 (2001).

"Because an investigative detention is a temporary seizure that restricts a person's movement, it must be based on an officer's 'reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity.'" Rosario, 229 N.J. at 272 (alteration in original) (quoting State v. Stovall, 170 N.J. 346, 356 (2002)). "The 'articulable reasons' or 'particularized suspicion' of criminal activity must be based upon the law enforcement officer's assessment of the totality of the circumstances . . . ." State v. Davis, 104 N.J. 490, 504 (1986). "There must be 'some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity.'" State v. Pineiro, 181 N.J. 13, 22 (2004) (alteration in original) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). However, "[t]he

suspicion need not rise to the 'probable cause necessary to justify an arrest.'" Id. at 20 (quoting State v. Nishina, 175 N.J. 502, 511 (2003)).

Reasonable suspicion is an objective, fact-sensitive inquiry. Id. at 22. A court must determine "whether at the moment of seizure, the officer had at his [or her] command sufficient facts supporting a person of reasonable caution in the belief that seizure was appropriate." State v. Dunbar, 434 N.J. Super. 522, 526 (App. Div. 2014). An investigatory stop is not permissible if it is based on "arbitrary police practices, the officer's subjective good faith, or a mere hunch." State v. Coles, 218 N.J. 322, 343 (2014). In addition, the court must "determine whether the subsequent scope of the seizure was justified by the particular facts and circumstances of the case." Davis, 104 N.J. at 504.

In contrast, a field inquiry is less intrusive than an investigatory stop. Police do not violate the Fourth Amendment by "merely approaching an individual on the street" and "asking him if he is willing to answer some questions," or "by putting questions to him if he is willing to listen . . . ." Id. at 497 (citing Florida v. Royer, 460 U.S. 491, 497 (1983)); accord State v. Gibson, 218 N.J. 277, 291 (2014). A person approached by a police officer for a field inquiry need not respond to the officer's questions and is free to leave. Rosario, 229 N.J. at 271. However, if the officer gives the impression that the person is

12

not free to refuse to answer questions or leave, or that the person is the target of an investigation, an articulable suspicion of criminal activity is required. Id. at 272-73.

A reviewing court evaluates the totality of the circumstances, "balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions." Davis, 104 N.J. at 504. We consider the officer's experience and knowledge. Pineiro, 181 N.J. at 22 (citing Davis, 104 N.J. at 504).

The plain-view doctrine is another recognized exception to the warrant requirement. State v. Williams, 461 N.J. Super. 1, 10-11 (App. Div. 2019). It "authorizes a police officer to seize evidence or contraband that is in plain view." State v. Gonzales, 227 N.J. 77, 90 (2016). Under the plain-view doctrine, the "officer must lawfully be in the area where he observed and seized the incriminating item or contraband, and it must be immediately apparent that the seized item is evidence of a crime." Id. at 101.

Applying these well-established principles, we affirm the suppression of the handgun seized from defendant substantially for the reasons expressed by Judge Caulfield in her comprehensive and well-reasoned written decision. Judge Caulfield's factual findings are amply supported by the record. Her legal

13

conclusions drawn from those facts are consonant with controlling precedent. We discern no factual or legal basis to overturn her decision. We add the following comments.

Pereira was dispatched to "a male and female dispute." The CAD report stated that a "[l]andlord report[ed] that the 'tenant was arguing with her grandson.'" There was no indication any concern for domestic violence. When Pereira arrived, he observed a verbal argument and chose not to intervene immediately because he did not observe a physical confrontation, any other criminal activity, or a weapon. There was no indication that defendant or the female were injured. Nor did it appear that the argument was escalating. Therefore, there was no reasonable basis to suspect criminal activity would occur soon thereafter.

Moreover, "flight alone does not create reasonable suspicion for a stop." Dangerfield, 171 N.J. at 457. However, flight "in combination with other circumstances" may create a reasonable and articulable suspicion. Pineiro, 181 N.J. at 26. The judge found "there were no circumstances of any kind to support a suspicion of criminal activity."

Under these circumstances, Pereira did not have an objectively reasonable and particularized suspicion that defendant had engaged in, or was about to

14

engage in, criminal activity. While it was permissible for Pereira to conduct a field inquiry, he did not have a legally sufficient basis to conduct an investigatory stop. Accordingly, defendant was free to leave without answering Pereira's questions unless Pereira audibly identified himself as an officer and defendant heard his commands. If that had occurred, defendant's purposeful refusal to obey would constitute obstruction by means of flight, N.J.S.A. 2C:29-1, Crawley, 187 N.J. at 451-52, 460, even if "the legal underpinning of the police-citizen encounter is questionable," State v. Reece, 222 N.J. 154, 172 (2015).[2] The judge found the sequence of events proved otherwise.

> Here, the [c]ourt finds that there was no significant break in the causative chain between Pereira's attempt to conduct an unlawful Terry stop and defendant allegedly dropping a gun. It is true that defendant fled from a police officer, jumping over a fence as he ran. But the State has not shown that defendant was aware that he was fleeing from a police officer, or that defendant even heard the officer's command to stop. As mentioned, defendant was jumping over the fence before the officer stopped his car. Pereira did not identify himself as an officer nor did he command defendant to stop until he had followed defendant over the fence. At that point, defendant was walking away, not running. It does not appear to this [c]ourt that defendant jumped over the fence, and

---

[2] Obstruction is a fourth-degree crime "if the actor obstructs the detection or investigation of a crime[,] . . . otherwise it is a disorderly persons offense." N.J.S.A. 2C:29-1(b). Notably, defendant was not indicted for obstruction and there is no indication he was charged with disorderly persons obstruction.

continued on his way, as a reaction to seeing a patrol car or hearing the officer call to him from inside the vehicle. And, as Pereira testified, only one second passed between the officer yelling to defendant to stay still, and when he grabbed defendant's arm.

As the officer followed defendant into the rear of 21 Lyons Place, defendant allegedly discarded a handgun. However, there was no intervening act that marked "the point at which the detrimental consequences" of the illegal police action became so "attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." Williams, 192 N.J. at 16.

We note that the officer approached in an unlit vehicle, in the middle of the night, through an empty parking lot. Considering the totality of the circumstances, defendant did not purposely obstruct by fleeing from a police officer who had audibly identified himself and commanded him to stop. Coupled with the absence of an objectively reasonable and particularized suspicion of criminal activity, Pereira was not authorized to make a Terry stop or grab defendant and take him to the ground. The handgun was not observed until after Pereira placed his hands around defendant's arms and held him. This continuous, uninterrupted sequence lasted only seconds. Because there was no attenuation of the illegal Terry stop, "any evidence obtained as a result of [the] unconstitutional stop must be suppressed." Crawley, 187 N.J. at 458.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16

A-3748-20