# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3314-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

A.R.G.,

      Defendant-Appellant.

_____

Submitted January 25, 2021 – Decided March 23, 2021

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-04-0625.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Craig A. Becker, Assistant Prosecutor, of counsel; Catherine A. Foddai, Assistant Prosecutor, on the brief).

PER CURIAM

A jury found defendant A.R.G.[1] guilty of twenty-eight counts that were charged in an indictment alleging that he committed various acts of sexual assault and related crimes against his girlfriend's two young daughters over the course of nearly ten years, with the children's mother's knowledge and consent.[2] After his trial, the judge sentenced defendant in the aggregate to two consecutive life terms followed by a consecutive forty-year period of incarceration, all subject to periods of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant appeals from his conviction and sentence, arguing the following points:

POINT I

DEFENDANT'S MOTION TO SUPPRESS HIS STATEMENTS TO THE POLICE WAS IMPROPERLY DENIED, AS DEFENDANT DID NOT MAKE A VOLUNTARY, KNOWING, AND INTELLIGENT WAIVER OF HIS FIFTH AMENDMENT RIGHTS.

---

[1] We refer to the defendant by initials to protect the victims' privacy. R. 1:38-3(c)(9).

[2] At defendant's trial, the mother testified that she had pled guilty to two counts of human trafficking, N.J.S.A. 2C:13-8, for her role in defendant's attacks against her children. Her plea was made without any recommendation by the prosecutor and she was sentenced to twenty years without parole.

POINT II

THE TESTIMONY OF FORENSIC NURSE EXAMINER LAURA ESPOSITO EXCEEDED THE SCOPE OF PROPER LAY OPINION AND CONSTITUTED IMPROPER EXPERT OPINION.

POINT III

THE TESTIMONY OF [THE VICTIMS' MOTHER] TO THE EXTENT THAT SHE AND DEFENDANT WERE EQUALLY GUILTY CONSTITUTED PLAIN ERROR.

POINT IV

DEFENDANT'S AGGREGATE SENTENCE OF TWO CONSECUTIVE LIFE SENTENCES PLUS 40 YEARS, AS CALCULATED BY THE TRIAL COURT, IS MANIFESTLY EXCESSIVE.

We are unpersuaded by any of defendant's contentions and affirm his conviction. We also affirm his sentence, but remand for correction of his judgment of conviction (JOC).

I.

The facts leading to defendant's arrest and conviction as developed at trial are summarized as follows. The victims' mother met defendant in 2010 and soon he began to provide support for her and the children, who were then about five and seven years old. According to the mother, "[a]lmost as soon as [they] got together" inappropriate conduct began between defendant and the children. By

3

2012, the mother was aware of defendant's attacks and although she "would feel bad" about what was happening, she took no action because she "needed the money to pay rent" that defendant gave her after assaulting her children. The attacks continued with her knowledge for years.

At some point prior to 2016, the mother left the girls with a woman while she and defendant took a trip. The woman evidently reported to authorities that the children had been abandoned. After child welfare authorities initially placed them outside their mother's care, the children were eventually returned to the mother and they all resumed living with defendant until 2015 when the mother and her children moved away from defendant's home in Englewood to Philadelphia.

After their relocation, the mother would send her children alone by public transportation and taxi for a five-hour trip to defendant on Fridays, and she would join them the next day. While she was there, defendant would sexually assault her children, with her knowledge. According to the mother, she sent the children to defendant even though they did not want to go. As one of the victim's explained, her mother "was basically like selling my body, and then she would get the money."

4

In 2016, defendant's neighbor reported to police that she believed one of the children was being abused. An investigation ensued, during which the older child told the police what had happened to her, and she was taken to the hospital for a forensic examination.

Defendant was later arrested on July 2, 2016, and on the same day he gave two statements to police that were video recorded. In his first statement, defendant explained his relationship with the victims and their mother. He eventually admitted to kissing and touching the older child and said that it started when she was ten years old, but he denied using force against her. He also denied sexual contact with the younger girl.

In his second interview, he explained that he sent money to the victims' mother for their travel from Philadelphia to New Jersey. He also said that the girls would let him touch them on their breasts and vaginas, over their clothes and sometimes he would put his fingers inside their vaginas. He claimed that when he was laying down sleeping, the girls would come over and touch him, including on his penis.

According to defendant, the girls were six and eight when they began touching him and that it all started as a game. He said that their mother knew the girls would touch him. He also explained that when the girls came from

5

Philadelphia on Friday nights, their mother knew that something could happen, but "it wasn't frequent and it wasn't always."

A grand jury later returned an indictment charging defendant in forty-two counts with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), N.J.S.A. 2C:14-2(a)(2)(c), second-degree sexual assault, N.J.S.A. 2C:14-2(b), N.J.S.A. 2C:14-2(c)(1) and (c)(4), second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a), third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a), fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b), and first-degree human trafficking, N.J.S.A. 2C:13-8(a)(3).

Before his trial, the trial judge dismissed counts fifteen through twenty of the indictment. A jury convicted defendant of four counts of first-degree aggravated sexual assault, sixteen counts of second-degree sexual assault, five counts of second-degree endangering the welfare of a child, and three counts of fourth-degree criminal sexual contact. The jury could not reach a verdict on the remaining three counts each of second-degree sexual assault, fourth-degree criminal sexual contact, and two counts of human trafficking. Thereafter, the trial judge sentenced defendant and entered his JOC. The judge later amended

A-3314-18

the JOC to indicate that, based on an Avenel report,[3] defendant's conduct was characterized by a pattern of repetitive and compulsive behavior, pursuant to N.J.S.A. 2C:47-3. This appeal followed.

II.

We begin our review by addressing defendant's challenge to the denial of his motion to suppress his two custodial statements to police. Defendant, who is of Mexican descent and was at the time approximately fifty years old, argues that under the totality of the circumstances, defendant did not knowingly and voluntarily waive his Miranda[4] rights. The circumstances included defendant's limited education, alleged eyesight and hearing issues, difficulty understanding different Spanish dialects, and law enforcement's failure to ensure the Spanish translators used in his interrogation were capable. We disagree.

A.

---

[3] An Avenel report refers to a report about a "psychological examination of the offender" that is required "[w]henever a person is convicted of the offense of aggravated sexual assault[.]" N.J.S.A. 2C:47-1. The examination must include a "determination of whether the offender's conduct was characterized by a pattern of repetitive, compulsive behavior." Ibid.

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

At the pretrial suppression hearing, the officers involved with taking defendant's statements testified, as did defendant. In addition, the video recordings of the interviews were played for the trial judge.

At the hearing, Officer Jose Miguel Sanchez, who had been an Englewood Police Officer for over nine years, testified that he assisted Detective Bradford Waudby with the interview of defendant by serving as a translator, although at times during the interview, Sanchez asked defendant his own questions. Sanchez who was of Dominican descent, spoke Spanish, his primary language, studied it in school, and spoke it every day with family and friends. He also served as an unofficial interpreter for other officers when they conducted interrogations or other interviews of Spanish speaking individuals. As Sanchez explained, Englewood is "[forty] percent Latino and Hispanic, particularly of Colombian descent," but it did not matter where a Spanish speaking person came from because "the way we speak to each other is common" and "the meanings of all the words are the same."

As to defendant, for the most part, Sanchez did not have any problems communicating with him. If any clarification was needed, they would stop the interview and Sanchez would make sure he understood what defendant was saying.

At the hearing, Sanchez also identified the Miranda form used in defendant's interview. Before the interview, he read defendant's rights in Spanish directly from the form. He testified that the word "sí" appeared on the form in defendant's handwriting and defendant's initials appeared next to each right listed on the form, as well as defendant's, Sanchez's, and Waudby's signatures at the bottom of the form.

Sanchez also identified a transcript of the interview, which he previously reviewed by comparing it to the recording while "sitting in front of a computer with headphones on, looking and listening to the interview multiple times over for several hours." As he went through it, he made minor corrections before it was finalized.[5]

In response to questioning by the judge, Sanchez addressed differences in the Spanish language between cultures and whether there were different idioms and nuances. Sanchez stated, "there are certain words that may be expressed in a different manner," but the "essence of what's being discussed is the same." As to different dialects, Sanchez said there were not different dialects that would present any problems with him interpreting. Sanchez reiterated that he did not

---

[5] Defense counsel confirmed at the hearing that she was "satisfied based on [her] experience and . . . review of the DVD and [her] knowledge of Spanish that the transcript [was] accurate."

have difficulty communicating with defendant, even though he was not a court-approved interpreter and did not have formal training as an interpreter.

Sanchez also addressed "what [he] believe[d was his] duty . . . or . . . obligation" to "to interpret to the best of [his] ability." By that, Sanchez meant his duty was "to understand and comprehend what [defendant was] telling [him] and be able to translate it to [his] fellow colleague." Sanchez explained that interpreting was usually done verbatim, and he said that as to defendant's interrogation, the questions asked of defendant were all interpreted verbatim, although there might of have been times he possibly did not interpret verbatim. He also explained that there were times where Waudby asked defendant questions in English and defendant responded in English, which Sanchez did not translate because defendant seemed to have understood the question.

The prosecutor played the video recording during Sanchez's testimony. At times, the trial judge stopped the tape so he could ask questions. First, he asked Sanchez about a portion of the interview where Sanchez and Waudby were discussing defendant's answer in English, and Sanchez was not explaining in Spanish what they were discussing to defendant. The second time, he asked Sanchez about a portion of the interview where he did not translate verbatim. Last, the judge asked about the tape depicting Sanchez leaving the room at one

point, and verifying that he was watching "the . . . Spanish interpreter [being] outside the room [while] the interrogation . . . or interview [was] being continued in English."

After playing the video, the prosecutor asked Sanchez about the reading of Miranda rights, and he again explained that he read them aloud and when asked if he understood, defendant nodded his head, which the trial judge confirmed he saw on the videotape. The prosecutor also asked Sanchez about defendant asking Sanchez if the answer on the form should be "yes" when it stated that "You have the right to remain silent." Sanchez explained he did not answer defendant's question. Instead, he told defendant "[i]f you understand please put yes here and initial there."

Detective Waudby also testified about his interviews of defendant. He recalled Sanchez reading the Miranda form in Spanish at the beginning of defendant's interview. He also recalled Sanchez handing defendant the form to have him read it on his own. He did not recall whether anyone asked defendant if he understood the form. As to the second interview, Waudby remembered Detective Ana Bedoya, who translated for him during that interview, read the Miranda form to defendant in Spanish. He also recalled that defendant read the form to himself.

11

Detective Bedoya also testified at the hearing. She described her experience speaking and interpreting Spanish for the police department almost on a daily basis, although she had never translated a <u>Miranda</u> waiver for an interrogee before defendant. She also did not have any training as an interpreter. Bedoya explained how she reviewed the Spanish <u>Miranda</u> waiver form with defendant, who wrote his responses to her questions on the form. During her testimony, the prosecutor played the recording of defendant's second interview.

When defendant testified, he testified that he only completed six years of schooling and that he reads and writes Spanish with difficulty. He also described physical impairments that made it difficult for him to understand what was happening at his interviews. He said he had vision issues, could not see a document up close, and could not read. He noted that while he had glasses, he was not wearing them during the interviews. He claimed that he told the officers he needed glasses and could not see the document.

Defendant also said although the police read something to him, he was having difficulty hearing what was being said. In response to questioning by the trial judge, defendant explained that a headset he was wearing in court that day allowed him to hear what was being said. He also explained that he had never been treated by a doctor for his hearing. Moreover, he confirmed he

understood the interpreters in court that day but could not tell where the new interpreters were from based on their accents. He found that the interpreters spoke "properly" and they "pronounce[d] the letters" and the interpreters were "able to make [him] understand the language."

After considering the testimony, video recording, and other evidence presented at the two-day hearing, the trial judge denied defendant's motion and placed his reasons on the record on August 30, 2018. The judge explained that it was the State's burden to prove beyond a reasonable doubt that the defendant understood all of his rights. As to his credibility findings, the judge credited Sanchez's and Bedoya's testimonies. He explained that Sanchez honestly admitted that he did not have any training in being an interpreter, did not question defendant regarding his education, or his ability to understand the Spanish language, "as it was being interpreted to him." Sanchez also acknowledged times in the interview when he paraphrased defendant's answers rather than interpret them verbatim. He also found that Bedoya was "straightforward" about not asking defendant about his education and literacy, that she acknowledged she was not a court-certified interpreter, and never testified in court before.

13

As to defendant, the judge found him to be "totally not credible." He indicated on direct examination that he told the officers about his vision problems, but that was not reflected in the transcript and was not depicted in the video the judge observed. He also explained that the "nonverbal body language" of defendant "did not indicate" that defendant had trouble seeing. From the video of the interview, it appeared defendant read the Miranda form. He also added that Sanchez told defendant if he did not want to speak with the officers, to tell him now and they would not ask any questions.

The judge observed that there is no particular Miranda formula, and the mandate was that defendant be given his rights, understand them, and knowingly, intelligently, and voluntarily waive them. He noted that this was done verbally and was "clearly indicat[ed] from both the transcript and from the video."

The judge also expressed "serious doubts" as to defendant's claim that he did not understand either Sanchez or Bedoya. He stated "it is clear to me again, one that the defendant did not at any time, indicate that he couldn't understand." He added, "[b]ut it would seem that any reasonable person who is spoken to, who couldn't understand what the question is or couldn't understand what is happening would either appear to be confused, act confused[,] or state . . . I don't

understand." From the video, the judge explained that defendant answered every question and his answers were appropriate.

The judge also found that defendant had a motive to not tell the truth and that motive was obvious. In all, he found defendant not credible from defendant's testimony at the hearing, his body language, his demeanor on the stand, and "just the way he answered the questions, along with the substance of his answers."

After making that finding, the judge concluded "the State ha[d] proven beyond all reasonable doubts that defendant understood each and every one of his rights under <u>Miranda</u>." He found that defendant understood the recitation of his rights, by nodding or writing "sí" and understood the waiver as well. He found this occurred during both interviews. The judge concluded that defendant knowingly, intelligently, and voluntarily waived his rights.

Addressing a challenge raised by defendant to the interpreters and interrogators acting in a dual capacity, the judge noted that there was no requirement that an interpreter in the police-setting be bound by the court rules on interpretation. He found no issue with Sanchez or Bedoya acting as an interpreter and found no constitutional issue with them reporting defendant's answers to Waudby.

B.

In our review of a trial judge's determination on a motion to suppress a statement, we defer to the trial judge's factual findings, State v. Sims, __ N.J. Super. __, __ (App. Div. 2021) (slip op. at 15) (citing State v. Tillery, 238 N.J. 293, 314 (2019)), "because the trial court has the 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. S.S., 229 N.J. 360, 374 (2017)). That deference applies to the trial judge's findings based upon his or her "review of a video recording." Ibid. (quoting S.S., 229 N.J. at 386). "However, we review de novo the trial [judge]'s legal conclusions that flow from established facts." Ibid. (citing Tillery, 238 N.J. at 314).

At a suppression hearing, the State has the burden to "prove beyond a reasonable doubt that the suspect's waiver [of rights] was knowing, intelligent, and voluntary." Id. at __ (slip op. at 16) (alteration in original) (quoting State v. A.M., 237 N.J. 384, 397 (2019)). In determining whether the State met its burden, a judge considers the "totality of the circumstances," which includes such "factors such as the defendant's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental

exhaustion was involved." Ibid. (internal quotation marks omitted) (quoting A.M., 237 N.J. at 398).

When an interpreter is used in an interview or interrogation of a suspect, the Supreme Court has explained that "[t]o eliminate questions about a suspect's understanding, the entire Miranda form should be read aloud to a suspect being interrogated, or the suspect should be asked to read the entire form aloud." A.M., 237 N.J. at 400. Where neither of those are done, "the suspect should be asked about his or her literacy and educational background." Ibid. It added that, "the State, as well as the defendant, is best served by the use of a capable translator during an interview." Id. at 401.

In A.M., the Court also acknowledged the benefit of a video recorded interrogation. It explained, where a video recording is presented, a judge is better able to assess a defendant's "overall deportment and conduct as well as the officers' demeanor and conduct throughout the custodial interrogation." Ibid.

Applying these guiding principles here, we have no cause to disturb the trial judge's denial of defendant's motion. Here, the judge made credibility findings that led him to conclude that defendant did not experience the difficulties he testified about during the hearing, and the judge's conclusions

were supported by his findings that were derived from the video of defendant's behavior while being questioned and responding to the officers. Moreover, he found that, as evident from the officers' testimonies, the transcript, and the video, they read defendant his rights aloud, gave him an opportunity to read them, and there was no indication that he did not understand as he acknowledged his understanding through his words, body language, and signing the Miranda form.

## III.

Next, we consider defendant's argument, raised for the first time on appeal, that the trial testimony of a nurse examiner exceeded the "legitimate" bounds of proper lay opinion and the failure to qualify her as an expert "possess[ed] a clear capacity to bring about an unjust result in this case." According to defendant, it was error for the nurse to have been allowed to "opine[] that the ecchymosis she observed, [when she examined the older victim] 'could be a hick[e]y,'" report that the victim had no vaginal trauma, "opine[] as to the prevalence of vaginal trauma in sexual assault cases, and provide[] a detailed description of the vaginal examination that she conducted, [including] the buccal, vaginal[,] and anal swabs that were taken, which she explained were necessary for DNA testing." In sum he argues that as a lay

18

witness, the nurse gave "both improper lay opinion and scientific testimony [which] should have come only from a qualified expert testimony." He argues that the trial court's refusal to qualify her and to provide the jury with a proper jury instruction was error. We disagree.

## A.

At trial the State called Laura Esposito, a forensic nurse and sexual assault nurse examiner. Her experience in the field included personally performing approximately 100 exams since she began this work in 2011. As part of her training, she participated in a sexual assault nurse examiner course which was about sixty-four hours of coursework, and she had to conduct gynecological exams on healthy patients in order to be able to compare what a traumatized and untraumatized patient would look like. As part of this job, she also participates in a case review team with other nurses, and they conduct monthly case reviews in order to learn from one another and sharpen their skills. She previously testified in court on two occasions regarding her examinations and was qualified as a forensic nurse on both occasions. After recounting this experience, the prosecutor sought to qualify Esposito as an expert in forensic nursing.

Responding to the proffer, at sidebar, the trial judge asked whether Esposito would be giving opinion testimony or if she would just be recounting

what she did as part of her examination. The prosecutor responded that while she would be describing her examination of one of the victims, she would not be offering any opinions as to whether a sexual assault occurred. For that reason, the trial judge refused to qualify the nurse as an expert in the same manner he would not qualify a police officer as an expert where the officer was not relating his opinions to the jury but only describing his or her actions.

The judge then instructed the jury that Esposito already told the jury her qualifications and she was "not going to be giving opinion testimony. [She] is just going to be telling us what she did as a forensic nurse." He stated to the prosecutor that Esposito was "just going to be telling us what she did as a forensic nurse[,] is that correct?" The prosecutor responded "Your Honor, yes that's correct."

In response to the prosecutor's further questioning, Esposito explained that she conducted a forensic medical examination of the older victim at a local hospital on July 2, 2016, and described how the examination was usually conducted. Included in her description was an explanation of how an alleged victim's body is examined for signs of trauma, including bruising or other injuries.

20

As to the exam she conducted of the older victim, during a head-to-toe assessment, she noted ecchymosis on the child's left and right breast and took photographs of those injuries. She explained that "[e]cchymosis is a medical term for blood underneath the skin surface. So . . . in layman's term kind of like a bruise . . . ." The prosecutor then asked her "[c]ould it be from a hick[e]y?" and she responded "[i]t could be."

During the exam, she did not observe any trauma to the child's vaginal area. The prosecutor asked her whether the lack of indications of trauma was "common from somebody who is alleging that they just engaged in sex . . . ?" The nurse explained that it was "very common" and the "statistics of having a vaginal trauma is not very high," and depended on several factors, such as "[the] patient's lubrication, skin elasticity, . . . if the patient is fighting back." So, it was "not very common to have a vaginal trauma."

Esposito also described how she took a buccal swab, which is a swab of a patient's DNA, from the inside of the child's cheek. In total, she did a buccal swab, an external genital swab, a vaginal wall swab, a cervical swab, and an anal swab. She took those swabs based on the information the child reported at the beginning of the examination.

A-3314-18

On cross-examination, defendant's counsel asked Esposito about why not seeing trauma was "not unusual" and she again repeated her testimony on direct about the factors involved. Counsel then asked her "[w]hen you see in your assessment trauma has occurred . . . how is that different from when you're looking at something when you say no trauma has been done?" She responded, "I don't interpret anything. I would take a picture if I saw trauma, and then I would pass it off to detectives." She also explained that trauma could look like bruising or a tear to the vaginal area.

As to the ecchymosis, Esposito reiterated that on the day of the exam, she saw three circular spots and took a picture. Defense counsel attempted to elicit from her an opinion as to what might cause the bruising. In response, Esposito reiterated that she was not giving any opinions regarding her interpretation of what she saw and only took pictures of what she observed at the examination.

The judge interjected during the cross-examination and reminded Esposito that she could not offer any opinion testimony, which she acknowledged by stating "I'm not going to – I'm trying not to – I'm trying very hard to not give an opinion." Nevertheless, defense counsel then asked if the bruising "could be caused by other factors then somebody's mouth being placed on the area?" Esposito responded that she would "not interpret[] what they were."

22

B.

As already noted, defendant never raised any objection to Esposito's testimony at trial. For that reason, our review of the arguments he raises on appeal about Esposito's testimony are reviewed only for plain error. R. 2:10-2.

"Plain error must be 'sufficient [to raise] a reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached.'" State v. Feal, 194 N.J. 293, 312 (2008) (quoting State v Daniels, 182 N.J. 80, 102 (2004)). "That determination must be made in the context of the entire record." State v. Sowell, 213 N.J. 89, 108 (2013). In applying this standard, we "may consider whether, absent the evidence admitted in error, there was overwhelming evidence of the defendant's guilt." State v. Sui Kam Tung, 460 N.J. Super. 75, 98-99 (App. Div. 2019), certif. denied, 240 N.J. 249 (2020).

Applying that standard, we conclude that while the trial judge's admission of Esposito's unchallenged testimony about her opinion as to the possible causes of the victim's ecchymosis, and about the lack of trauma being common in sexual assault cases, crossed over into areas usually reserved for expert opinion, the error, if any, was harmless. See N.J.R.E. 702; State v. Covil, 240 N.J. 448, 463-64 (2020) ("That rule authorizes the admission of expert testimony 'in the form of an opinion' '[i]f scientific, technical, or other specialized knowledge will

assist the trier of fact to understand the evidence or to determine a fact in issue.'" (quoting N.J.R.E. 702)). Although such opinion testimony is reserved for experts who have been qualified by a court, see Alpine Country Club v. Borough of Demarest, 354 N.J. Super. 387, 394 (App. Div. 2002) ("Lay testimony may not usurp the function of expert opinion"), here, before Esposito testified to these limited opinions, "a proper foundation had been laid as to [her] . . . experience and training in this area . . . . Because enough evidence was presented to qualify [Esposito] as an expert in this area, the trial court's error in failing to specifically qualify [her] as an expert was harmless." State v. Kittrell, 279 N.J. Super. 225, 236 (App. Div. 1995).

Moreover, the other evidence of defendant's guilt in this case was overwhelming. That evidence included testimony from the victims and their mother about the abuse children endured for approximately ten years; expert testimony of forensic scientists with the New Jersey State Police, who addressed the proof established by the swabs Esposito took during her examination; and, defendant's inculpatory statements to police.

Under these circumstances, we conclude that Esposito's limited expert opinions did not give rise to a reasonable doubt as to whether the jury reached a

24

decision it might otherwise not have reached in this matter had the testimony been excluded.

IV.

We reach a similar result as to defendant's next contention, also raised for the first time on appeal, that it was plain error for the trial judge to allow the victim's mother to impermissibly testify as to defendant's guilt during cross-examination by defense counsel. He contends, "[t]estifying as a lay witness, [the mother] was not asked for, nor should she have offered any opinion, much less the opinion that she and [d]efendant were equally guilty of wrongdoing."

The challenged testimony occurred during defense counsel's inquiry about the witness's interviews by police. She had admitted at trial not telling the truth to the police in her first interview because defendant was still supporting them and she wanted him to be released from custody. During counsel's questioning, the following exchange occurred:

> Q. Now although you said in the second interview that you knew that he was having sexual relationships with your daughters, you still thought he should be released?
>
> A. No, but as I said I would have told the truth as I am doing now. I am telling the truth now. And we are both found in the same situation.
>
> Q. (indiscernible) situation?

A. That we are both at fault for having done things that we shouldn't have done, but that we did.

….

Q. What were some of things that you're not -- that you're saying that you should not have done?

A. Allow sexual relations with my daughter[s].

We conclude that the admission of the mother's testimony under these circumstances was not an error. Her statement merely summarized and referred to her detailed testimony on direct about how she allowed her children to have sex with defendant in exchange for money and support. Moreover, and contrary to defendant's contention, the mother's testimony was not similar in this regard to impermissible expert "ultimate-issue testimony [that] usurp[s] the jury's singular role in the determination of defendant's guilt and irredeemably taint[s] the remaining trial proofs." State v. Reeds, 197 N.J. 280, 300 (2009).

V.

Last, we address defendant's argument that his JOC did not reflect the sentence imposed by the trial judge and, in any event, his actual sentence was excessive. In support of his latter contention, he argues that aggravating factor one should not have applied, the judge's application of that factor constituted double-counting, and the trial judge did not make sufficient findings.

26

In addition, defendant argues that the judge applied the aggravating factors "blanketly" without consideration of the fact the offenses ranged from first to fourth-degree. He also urges that the judge improperly sentenced him to the statutory maximum for each crime but "provided no reasons for the imposition of [twenty-eight] maximum sentences on this [fifty-three] year old first offender." Finally, defendant argues that the judge erred by sentencing him to consecutive sentences.

We find no merit to defendant's contentions, except, we are constrained to remand the matter for correction of defendant's JOC because, as the State acknowledges on appeal, it sets forth a sentence different than the one imposed by the trial judge at sentencing.

## A.

At sentencing, the trial judge found aggravating factor one applied to defendant's crime. He explained that "the nature of the offense [was] so despicable . . . and . . . horrendous," and supported his finding with the facts that the repeated sexual abuse went on for approximately ten years, defendant would have his victims sent to him alone from another state, and that defendant paid the mother for doing so.

 A-3314-18

The judge also found that factor two was applicable. In support of that finding, he relied upon the victims' testimony and their statements and concluded that defendant caused "severe psychological harm to these children," by taking away their innocence, their youth, and "their life [as] they are never going to forget what happened. They are going to be impacted until the day that they die."

The judge also found aggravating factor three, even though he noted that it was doubtful defendant would be committing other offenses because he was going to prison. He applied the third factor because he found that there was a high risk that if defendant had not been caught, he would still be abusing the girls to this day, or he would have found other children to prey upon. He also found aggravating factor nine, which he weighed heavily because of the need to not only deter defendant but also others from sexually abusing children.

As to the mitigating factors, defendant argued for factors three, four and five. In response, the trial judge noted that in the Avenel report, defendant reported that "the two children, played with him in a manner that made him believe that they were looking for it." The judge concluded that it would be "totally unconscionable" to find mitigating factors three, four, and five, as "[t]o assign any responsibility to these victims would be a miscarriage of justice."

The judge also rejected defendant's request to apply mitigating factors eight, nine, and twelve, but did apply mitigating factor seven, although he assigned "very little weight" to it because for the past nine to ten years, defendant had been committing criminal acts on the victims. On balance, he found that the aggravating factors substantially outweighed the one mitigating factor.

He then sentenced defendant to ten years on each count on count one through count eleven. Those counts charged defendant with second-degree sexual assaults and endangering the welfare of a child, with separate counts as to each victim during 2007 through 2010, and separate counts as to the older child between 2013 through 2014. As to count twelve, that charged first-degree aggravated sexual assault as to the older victim from 2013-2014, the judge sentenced defendant to twenty years. For count thirteen, that charged first-degree aggravated sexual assault against the older victim over seven months in 2014, he sentenced defendant to life imprisonment.

For count fourteen, that charged second-degree endangering of the older victim through May 2014 to December 2014, and counts twenty-seven, through

29

twenty-nine,[6] that charged second-degree aggravated assaults against the older victim from December 2014 to July 2016, he sentenced defendant to ten years on each count. For counts thirty through thirty-two that charged fourth-degree criminal sexual contact, he sentenced defendant to eighteen months for each. On count thirty-three, another endangering charge as to the older child for December 2014 to July 2016, he sentenced defendant to ten years.

On counts thirty-five through thirty-eight, which charged second-degree sexual assaults upon the younger victim from July 2013 through July 2016, he sentenced defendant to ten years on each count.[7] For counts thirty-nine and forty, which charged first-degree "Lunsford offenses" of aggravated sexual assault,[8] he sentenced defendant to life imprisonment on each count.

---

[6]  As the judge explained, "Counts [fifteen] through [twenty] were dismissed prior to being submitted to the jury during the trial, before the trial began. Counts [twenty-one] through [twenty-six], the jury was hung, had no verdict. The State afterwards agreed to have those charges dismissed, and the Court dismissed them."

[7]  The judge explained that as to count thirty-four, the jury was unable to return a verdict and the State asked for the charge to be dismissed.

[8]  Under the Lunsford Act, N.J.S.A. 2C:14-2(a)(1) "[a]n actor is guilty of aggravated sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances[,]" and subsection one reads "[t]he victim is less than [thirteen] years old."

A-3314-18

Finally, for count forty-one, which charged a second-degree endangering offense as to the younger victim, the judge sentenced defendant to ten years. The judge then calculated that the total was 230.5 years, plus three life terms.

The trial judge then conducted an analysis as to whether to run the counts consecutive or concurrent under Yarbough.[9]  He explained "there are no free

---

[9]  State v. Yarbough, 100 N.J. 627 (1985), superseded by statute in part, N.J.S.A. 2C:44-5(a), as recognized in State v. Cuff, 239 N.J. 321, 348 n.4 (2019) (explaining factor six was "no longer part of the Yarbough inquiry" following the Legislature's amendment providing there is no outer limit on the cumulation of consecutive sentences).  In Yarbough, the Court adopted criteria as general sentencing guidelines for the determination of whether to impose concurrent or consecutive sentences.  Id. at 644-45.  The Court instructed trial courts to focus on "five facts relating to the crimes":

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous.

31

crimes" and noted that "even when the offenses are connected by a unity of specific purpose, in this case, sexually assaulting someone . . . it doesn't necessarily mean that concurrent sentences must be imposed." In going through the counts, he noted which counts applied to the older or younger victim, and whether the counts were based upon a new set of assaults that occurred during different time periods.

The judge summarized the outcome of his findings by stating "[s]o the aggregate is [forty] years; [ten] plus [ten] plus [ten] plus [ten], plus two life sentences consecutive to each other. In other words, after [defendant] serve[s] . . . the first life sentence, [he] could serve the second life sentence. After . . . that, [he] can serve [forty] years NERA, which will be approximately an additional [thirty-four] years."

The judge entered the original JOC on January 18, 2019. He issued an amended JOC on January 30, 2019, which states that defendant is sentenced to an aggregate term of two life terms plus forty years. It reached that aggregate by first stating the ten-year sentences on counts one through four are to run

> [State v. Molina, 168 N.J. 436, 441-42 (2001) (quoting Yarbough, 100 N.J. at 644).]

concurrent to each other; then having counts six through eight, nine through eleven, and thirty-five through thirty-eight, all run consecutive to counts one through four.[10]  Additionally, count twelve was ordered to run concurrent to count thirteen, but consecutive to counts one through four.  Count thirteen, the life sentence, was ordered to run consecutive to counts one through four.  Counts thirty-nine and forty, life sentences, were ordered to run concurrent with each other and consecutive to count thirteen.

B.

i.

Our "review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard."  State v. Jones, 232 N.J. 308, 318 (2018).  We "may disturb a sentence imposed by the trial court in only three situations: (1) the trial court failed to follow the sentencing guidelines, (2) the aggravating and mitigating factors found by the trial court are not supported by the record, or (3) application of the guidelines renders a specific sentence clearly unreasonable."  State v. Carey, 168 N.J. 413, 430 (2001) (citing State v. Roth, 95 N.J. 335, 365-66 (1984)).

---

[10]  The charges within each group were to run concurrent to one another, but each grouping was ordered to run consecutive to counts one through four.

We conclude the judge did not abuse his discretion in applying the aggravating and mitigating factors or in imposing the sentence he did based on the findings he placed on the record at sentencing. As to aggravating factor one, N.J.S.A. 2C:44-1(a)(1) ("The nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not it was committed in an especially heinous, cruel, or depraved manner"), the judge's conclusion was properly supported by "facts showing defendant did more than the minimum the State was required to prove to establish the elements of the offense." State v. A.T.C., 454 N.J. Super. 235, 255 (App. Div. 2018); State v. Lawless, 214 N.J. 594, 599 (2013). They did not rely upon the "[e]lements of a crime, including those that establish its grade." A.T.C., 454 N.J. Super. at 254 (quoting Lawless, 214 N.J. at 608). "To do so would result in impermissible double-counting," which the sentencing court must "scrupulously avoid." Ibid.; State v. Fuentes, 217 N.J. 57, 74-75 (2014).

Here, none of the facts the judge relied upon were required to convict defendant. They included the duration of the crimes, the repeated nature of them, defendant's promoting the mother's complicity by paying her, and having the children travel alone across state lines at a young age so that he could carry out his crimes. None of these factors were required to prove defendant's guilt.

The judge applied factor one based "upon factors independent of the elements of the crime and firmly grounded in the record." A.T.C., 454 N.J. Super. at 254; see also Fuentes, 217 N.J. at 63.

Equally without merit is defendant's contention that the judge failed to give adequate reasons for the sentence he imposed. As already described, the judge gave the "factual basis supporting [the] finding of particular aggravating or mitigating factors affecting [the] sentence." Fuentes, 217 N.J. at 63 (quoting R. 3:21-4(g)).

We also reject defendant's contention that the judge blanketly applied the aggravating factors without consideration of the fact the offenses ranged from first to fourth-degree. For the reasons stated by the judge, the factors applied to all of defendant's offenses that he carried out in the same manner over many years. There is nothing inconsistent about that finding when compared to the sentencing procedures and guidelines a trial judge must follow.

Finally, we find no error in the imposition of consecutive sentences in this matter, substantially for the reasons expressed by the trial judge. The judge's use of consecutive terms for "crimes involving multiple victims represent[s] an especially suitable circumstance for the imposition of consecutive sentences," see Molina, 168 N.J. at 442 ("total impact of singular offenses against different

victims will generally exceed the total impact on a single individual who is victimized multiple times" (quoting Carey, 168 N.J. at 428)), as they are for "crimes involv[ing] separate acts of violence." State v. Swint, 328 N.J. Super. 236, 264 (App. Div. 2000).

When imposing defendant's consecutive sentences, the trial judge relied on the fact that there were different victims, at different time periods, subjected to different crimes. The judge carefully grouped the counts as they related to the abuse of the older or younger victim, and the time periods during which defendant abused each victim. Thus, while these crimes may relate to defendant's overall specific purpose of abusing his victims, the crimes occurred in different manners, with different levels of abuse, to different victims, in different places, across different time spans. When multiple counts were similar or related in purpose, he did run them concurrently. There was adequate evidence in the record to support the judge's decision, and despite the obviously long duration of defendant's sentence, it does not "shock[] [our] judicial conscience." State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting Roth, 95 N.J. at 364-65).

ii.

Having concluded the sentence imposed was not an abuse of the trial judge's discretion, we address the error in the JOC.

Generally, there is nothing illegal about a sentencing judge requiring a less restrictive sentence to be completed before a more restrictive one, but if he or she chooses to do so, the judge must "explain the consequence of any sequencing and to justify its exercise of discretion to impose the specific real-time consequence based on the court's finding and weighing of aggravating factors." State v. Pierce, 220 N.J. 205, 205 (2014); see also State v. Ellis, 346 N.J. Super. 583, 597 (App. Div. 2002) ("In a very real sense, directing that a less restrictive sentence be served prior to the more restrictive sentence is akin to the discretionary imposition of an additional period of parole ineligibility. It should be imposed only when accompanied by specific findings").

Here, however, we conclude from the judge's express statement at sentencing that he did not intend to impose the less restrictive sentences first. As already explained, the trial judge advised defendant that he would serve the first life sentence, serve a second life sentence, and after that he would serve "forty years NERA, which will be approximately an additional [thirty-four] years." Because that sentence is not reflected in the current JOC, we are

constrained to remand the matter to the trial judge for correction of the JOC. See State v. Abril, 444 N.J. Super. 553, 564 (App. Div. 2016) ("In the event of a discrepancy between the court's oral pronouncement of sentence and the sentence described in the judgment of conviction, the sentencing transcript controls and a corrective judgment is to be entered").

Affirmed in part; vacated and remanded in part for further proceedings consistent with our opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3314-18