**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0616-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARCUS A. BROWN, a/k/a
ANTUAAN WILLIAMS and
ANTUANE J. WILLIAMS,

    Defendant-Appellant.

_____

        Submitted January 21, 2026 – Decided March 6, 2026

        Before Judges Gooden Brown and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 19-05-0186.

        Edward J. Crisonino, attorney for appellant.

        Jennifer Davenport, Acting Attorney General, attorney for respondent (Sarah D. Brigham, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant was convicted of five drug-related offenses and sentenced to an aggregate extended term of thirteen years in prison, one-third of which was to be served without parole, pursuant to N.J.S.A. 2C:43-6(f), which mandates the imposition of an extended term of imprisonment for a defendant previously convicted of similar drug related crimes. The charges stemmed from the execution of a search warrant at a home where defendant had been observed entering and exiting. A codefendant[1] had also been observed going in and out of the residence.

Prior to the execution of the search warrant, defendant was observed conducting multiple hand-to-hand drug transactions in proximity to the residence. The search revealed large quantities of cocaine and marijuana as well as drug paraphernalia and currency. After his arrest, defendant was administered Miranda[2] warnings at police headquarters and gave a statement that he unsuccessfully moved to suppress. In the statement, defendant ultimately admitted possessing the marijuana found in the residence.

---

[1] The codefendant died prior to trial. His records related to this case were expunged. See R. 1:38-1A ("[A]ppellate court decisions . . . make reference to information in court records even when those records are excluded from public access.").

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0616-24

On appeal, defendant raises the following points for our consideration:

POINT ONE

. . . DEFENDANT'S STATEMENT TO OFFICER WARE SHOULD HAVE BEEN SUPPRESSED.

POINT TWO

THE JURY DID NOT FIND THE PREDICATE CONVICTION NEEDED TO SENTENCE . . . DEFENDANT TO AN EXTENDED TERM.

We have considered these arguments in light of the record and applicable legal principles. We reject each of the points raised and affirm.

I.

On May 22, 2019, a Salem County grand jury returned a five-count indictment charging defendant and the codefendant with third-degree possession of a controlled dangerous substance (CDS), namely, cocaine, N.J.S.A. 2C:35-10(a)(1) (count one); second-degree possession of cocaine with intent to distribute in a quantity of one-half ounce or more, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(2) (count two); third-degree possession of CDS, namely marijuana, with intent to distribute in a quantity of one ounce or more but less than five pounds, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(11) (count three); second-degree conspiracy to possess cocaine with intent to distribute in a quantity of one-half ounce or more, N.J.S.A. 2C:5-2 and 2C:35-5(b)(2) (count four); and

3

third-degree conspiracy to possess marijuana with intent to distribute in a quantity of one ounce or more but less than five pounds, N.J.S.A. 2C:5-2 and 2C:35-5(b)(11) (count five).

Prior to trial, defendant moved to suppress his statement given to police after administration of <u>Miranda</u> warnings, which motion was denied on December 18, 2020. Subsequently, a three-day trial was conducted between May 30 and June 1, 2023, during which the State produced four law enforcement witnesses, including an expert in the field of illegal narcotics distribution. A private investigator testified for defendant regarding a recorded statement given to him by the codefendant, exculpating defendant of any wrongdoing. We glean these facts from the trial record.

On October 11, 2018, members of the Salem County Prosecutor's Office (SCPO) and other agencies executed a search warrant at a residence located on Thompson Street in Salem City (the residence). SCPO Sergeant Richard Ware conducted surveillance of the residence prior to the execution of the search warrant. Ware arrived at the residence around 9:00 a.m. on October 11, and surveilled the location for "approximately seven hours." In the morning, Ware observed the codefendant going in and out of the residence, appearing to do "handyman work." The codefendant was "carrying a . . . black . . . liquor store

bag and a . . . toolbox." Around noon, Ware observed defendant arrive in a BMW and park in front of the residence. After exiting his vehicle, defendant entered the residence "carrying a black liquor store[-]style [plastic] bag." After about "a minute or two," defendant exited the residence without the bag and sat in his BMW.

Over the next four hours, Ware observed defendant engage in multiple hand-to-hand transactions with different people. Ware described a hand-to-hand transaction as "one individual handing another individual something in exchange for another object." Although Ware could not see the item exchanged, he testified that each transaction transpired similarly—after the person arrived and spoke with defendant briefly, defendant entered the residence for a short period and, upon returning, reached out his hand to the person, after which the person left. Ware made a note of each transaction on his note pad and took a photograph when feasible from his vantage point.[3] The photographs were moved into evidence at trial.

At approximately 3:54 p.m., just before the search warrant was executed, another male approached defendant, prompting defendant to enter the residence

_____

[3] Ware was located in an abandoned house across the street from the residence, about fifty to sixty yards away.

A-0616-24

as he had done throughout the day. At that moment, the SCPO's "tactical entry team" arrived on scene to execute the warrant. SCPO Sergeant Patrick Vengenock was "number one in the stack, meaning when [the team] approached the house[, he] was the first one to go through the door." As Vengenock stood in the doorway about to enter the residence, defendant opened the front door and "met face-to-face" with Vengenock. Upon seeing Vengenock, defendant dropped three "purple, plastic screw-top vials" that he was holding containing suspected marijuana.

Defendant was removed and the residence was secured. The codefendant was found on the second floor. On the first floor, "six feet inside the front door," officers found large quantities of suspected cocaine and marijuana "on top of . . . and just underneath" a "small table." Inside a black liquor store bag was 196 vials of suspected marijuana with purple lids similar to the ones defendant had dropped. Numerous items of drug paraphernalia consisting of a digital scale, a razor blade, a drill, empty plastic bags, empty containers, and rubber bands, were also located in the front room on the first floor. Additionally, currency totaling $432 was seized from defendant.

Following the execution of the warrant, defendant was arrested and interrogated at the Salem City Police Department. The interrogation was

6

recorded and played for the jury at trial. At the beginning of the interrogation, defendant was administered his Miranda rights. Upon questioning, defendant ultimately admitted that the "marijuana" found on the first floor was his.

All drugs seized from the residence were submitted to the lab for analysis. New Jersey State Police Forensic Scientist Tara Crane confirmed that the drugs tested positive for cocaine and marijuana. The cocaine amounted to over one-half ounce and the marijuana amounted to over one ounce. Cumberland County Prosecutor's Office Lieutenant Raymond Cavagnaro, who was qualified without objection as an expert in the field of illegal narcotics distribution, testified that the quantity of drugs could indicate whether the person possessed the drugs for personal use or for distribution, with a larger quantity being indicative of distribution. Cavagnaro also explained that there is a difference between the paraphernalia possessed by a dealer versus a user. He opined that a dealer is more likely to have packaging materials because "[t]ypically," users would "get rid of the packaging materials" once they have ingested the narcotics to avoid having any incriminating evidence "if they're stopped by [the] police."

Private Investigator Brian DeCosmo testified for the defense. DeCosmo conducted a recorded interview of the codefendant about a month after the search warrant execution. In the interview, the codefendant acknowledged

A-0616-24

ownership of the residence and being present when the warrant was executed. He admitted that the drugs found at the house belonged to him, not defendant, and explained that he had "a really bad habit." In rebuttal, Ware testified that during a recorded Mirandized interview of the codefendant conducted immediately after the search warrant execution, the codefendant denied ownership of the drugs and claimed that he had given the residence to defendant.

On June 1, 2023, the jury returned a verdict of guilty on all counts. Defendant was subsequently sentenced and a conforming judgment of conviction was entered on November 1, 2024. This appeal followed.

II.

In Point I, defendant argues the judge erred in denying his suppression motion because defendant "never waived his Miranda [rights]." He asserts "[a]fter being advised of his rights," the officer "never asked him if he was willing to waive them" but "immediately" started questioning him. He also argues for the first time on appeal that although he invoked his right to remain silent by telling the officer "he did not want to incriminate himself," the officer "just kept questioning [him]."

At the Miranda hearing conducted on December 18, 2020, two witnesses testified for the State: Ware and SCPO Sergeant James Gillespie.

A-0616-24

Ware testified that after the search team arrived at the residence, defendant was detained and seated outside "on the sidewalk" while the residence was searched. After the search, defendant was arrested and transported back to the Salem City Police Station where he was charged and interrogated in the "booking room." Ware conducted the interrogation with the assistance of SCPO Investigator Jessica Venello and Pennsville Police Department Patrolman Bowen. The interrogation, which was recorded, began at 6:01 p.m. with Ware reading defendant his Miranda rights.[4]

Ware informed defendant orally and in writing that he had "the right to remain silent"; anything he said "may be used against [him]" in court; he had "the right to consult with an attorney" and "have him or her present before and during questioning"; and if he could not "afford an attorney, one [would] be provided . . . prior to any questioning." Ware told defendant "the decision to waive these rights is not final" and may be withdrawn "either before or during questioning." Ware asked defendant if he understood his rights and defendant responded in the affirmative. Ware then asked defendant to sign the form "saying that [Ware] read [it] to [him] and explained it" and indicating that

---

[4] Immediately prior to reading defendant his rights, Ware stated, "I'm not sure if they were read on the scene or not."

A-0616-24

defendant "understand[s]" his rights. Defendant signed the form, "acknowledg[ing] that [he] ha[d] been advised of the constitutional rights found" on the form.

After defendant signed the form, Ware explained defendant was there as "a result of . . . [the] search" that "yielded some narcotics." He told defendant they were trying "to determine who . . . should be held . . . responsible" and added they had spoken to the codefendant who "didn't really help himself." The questioning continued as follows:

> [Ware]: Do you think . . . [the codefendant] should be in jail?
>
> [Defendant]: No, I don't think nobody should be in jail.
>
> [Ware]: Okay. Um, do you think . . . the drugs we found in the house were [the codefendant's]?
>
> [Defendant]: I don't know whose it was.

Ware then questioned defendant about the number of times he had been observed entering and exiting the residence. Despite Ware telling defendant about his surveillance observations, defendant insisted he had only entered the residence once. The following exchange ensued:

> [Venello]: We're watching all day. We saw, you know, what was going on. Obviously we got what we got inside . . . . The more you want to help yourself, the

A-0616-24

better we can help you when we call the judge. It is what it is.

[Defendant]: So if I what? If I say it's mine, what I'm gone [sic] get released today or somethin' like, what's gonna help me? I'm going to jail . . . .

[Ware]: Huh uh . . . .

[Defendant]: . . . regardless.

. . . .

[Defendant]: I wish if I can help, I can help but I don't have the . . . .

[Ware]: . . . I respect that.

[Defendant]: I'm not gonna incriminate myself.

[Ware]: Okay . . . .

[Defendant]: . . . and then go in front and then . . .

[Venello]: . . . You're not gonna incriminate yourself but then you're gonna let somebody else take the fall for something that's not theirs?

[Defendant]: No[,] we gone [sic] fight it. And if, and we go to court, he's gonna get released. He knows that.

[Defendant]: If I incriminate myself right now, like, before we got a line, before—this is before I even get indicted like I'm not even . . . .

[Ware]: . . . Yeah . . . .

A-0616-24

[Defendant]: . . . Indicted nothing so if I'm saying this right now it's basically telling me I'm guilty regardless of indictments or anything, you understand what I'm sayin?

[Ware]: Yeah.

[Defendant]: I'd rather have that paperwork in my face, that discovery in my face and this and that in my face sayin' this is what you are facin'.

When Ware reminded defendant about the surveillance observations, defendant insisted it was hearsay, saying "I done beat a charge like that, cause it's hearsay. Cause they ain't have no cameras no nothin'." After Bowen mentioned the marijuana defendant was carrying when the warrant was executed, defendant relented and said, "Alright, I'm not gonna make it hard for ya'll. It's my stuff." He told Ware, "Release [the codefendant]. Hopefully I'll get released today." When Ware clarified whether the drugs "in the corner of the house" were defendant's, defendant responded "[y]es, was mine." When Venello asked whether it was "crystal meth" or "marijuana," defendant replied, "I don't know what that is. It was marijuana." The interrogation was concluded at 6:11 p.m.

Ware testified that during the interrogation, defendant did not appear to be under the influence of any substance nor was he suffering from any physical impairment. Ware confirmed that, to his knowledge, no other officer had

12

interviewed defendant. Ware further testified he was not advised by any officer that defendant invoked his rights or requested an attorney at the scene. Ware explained that as the case agent responsible for suspect interviews, he would have been informed if defendant had invoked his rights prior to being interviewed. Further, as the affiant on the search warrant application for the residence, Ware was also aware that defendant had a prior criminal history, which was admitted into evidence at the hearing.

Gillespie testified that he had assisted with criminal investigations of defendant in the past and had taken recorded statements from defendant previously. Gillespie specifically recalled taking a recorded statement from defendant on February 11, 2016, during which defendant was administered his Miranda rights. The administration of the rights for the February 11, 2016 statement was played at the hearing.

Following the hearing, the judge denied defendant's motion to suppress his statement. In an oral opinion, the judge acknowledged there was no express waiver of rights. The judge noted "the procedure that was used at the time did not include specifically asking whether . . . defendant was waiving his rights and did not include . . . acknowledging anything on the card to that effect." However, according to the judge, there was "an implied waiver" which is equally

13

acceptable under the case law, and the judge found the State "ha[d] met its burden" and "established that . . . defendant did impliedly waive his rights . . . to remain silent . . . and did, in fact, then provide the statement."

In recounting the interrogation, the judge found Ware's "words" and "demeanor" were "low-key" and not designed to compel defendant "to do something that he did not want to do." Similarly, the judge found defendant's "demeanor and words" showed "no indication that he was under any undue pressure" or coercion or "under the influence" of any substance "at the time." In considering the voluntariness of defendant's waiver, the judge explained:

> I find that . . . defendant had an opportunity to say, ["]I'm not going to answer your questions.["] He didn't do that. He had an opportunity . . . during . . . two periods of silence . . . to say anything. . . . This wasn't the type of interview where[] there's a . . . rapid succession of questions that a defendant would have very little time to interject. This was a situation . . . where he certainly . . . could have pointed out that he did not want to talk . . . . He didn't do that.

Further, the judge considered defendant's prior contacts with the criminal justice system to assess his familiarity with his rights, stating:

> [D]efendant, . . . it is established by the record here, has had his [Miranda r]ights read to him before. We heard a recording from 2016 where that was done. And we have his criminal history in evidence which suggests he has a prior history. [Defendant was] . . . arrested [seventeen] times prior, . . . including a number of

convictions, both on an indictable level and [a] disorderly persons level.

Despite Ware's comment immediately prior to reading defendant his rights that he was "not sure if they were read on the scene or not," crediting Ware's testimony, the judge determined there was "no evidence . . . that would support a finding" defendant "had previously said . . . he wanted an attorney and did not want to talk to the officers." The judge explained there was "no indication as to who might have done that or when that might have been done." The judge pointed out defendant had the opportunity during the interrogation to ask, "Why are you questioning me?" or "I told the other guy I didn't want to talk," or "I told the other guy I wanted an attorney" but defendant "never said that."

Our review of a trial court's denial of a suppression motion "is limited to confirming whether there is sufficient credible record evidence to support the trial court's findings of fact." State v. Erazo, 254 N.J. 277, 297 (2023). Therefore, ordinarily, an appellate court "must not disturb the factual findings made by the trial court even if it might have reached a different conclusion." Ibid. "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. A.M., 237 N.J. 384, 395-96 (2019) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). Deference to a trial court's factual findings is appropriate "because the

trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting Elders, 192 N.J. at 244). "That standard governs appellate review even when the trial court's findings are premised on a recording or documentary evidence that the appellate court may also review." State v. Tillery, 238 N.J. 293, 314 (2019) (citing S.S., 229 N.J. at 380-81).

However, "[t]o the extent that a trial court determination involved legal conclusions, we review those conclusions de novo." Ibid.; see State v. Handy, 206 N.J. 39, 45 (2011) (noting that whether established facts warrant suppression is a "purely . . . legal question" subject to plenary review); see also State v. O.D.A.-C., 250 N.J. 408, 425 (2022) (noting that the "determination of the validity of a waiver . . . is a legal, not a factual, question"); Miller v. Fenton, 474 U.S. 104, 110 (1985) (noting the ultimate issue of the voluntariness of a confession is a legal question); State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003) (same).

Turning to the governing principles of constitutional law pertinent to this appeal, "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503."

16

S.S., 229 N.J. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In Miranda, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination." State v. P.Z., 152 N.J. 86, 101-02 (1997) (citing Miranda, 384 U.S. 436).

As a result, when people

> in police custody [are] questioned by law enforcement, [they] must be told that [they have] the right to remain silent, that any statement [they] make[] may be used against [them], that [they have] the right to an attorney, and that if [they] cannot afford an attorney, one will be provided for [them].

[Id. at 102 (citing Miranda, 384 U.S. at 444).]

"Miranda imposes a fifth requirement: 'that a person must be told that he [or she] can exercise [these] rights at any time during the interrogation.'" Tillery, 238 N.J. at 315 (quoting Miranda, 384 U.S. at 479). These procedural safeguards, commonly referred to as "Miranda warnings," P.Z., 152 N.J. at 102, are intended "to secure the privilege against self-incrimination" and are required whenever custodial interrogation occurs. Miranda, 384 U.S. at 444.

Once the defendant is subjected to custodial interrogation requiring the administration of Miranda rights, "[t]he defendant may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly[,] and

intelligently." Miranda, 384 U.S. at 444. Under New Jersey law, "the State must 'prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances.'" Tillery, 238 N.J. at 316 (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

"To determine the question of waiver, the trial court reviews 'the totality of the circumstances surrounding the custodial interrogation.'" Ibid. (quoting A.M., 237 N.J. at 398).

> Under the totality-of-the-circumstances test, courts commonly consider a number of factors to determine if a Miranda waiver is valid. They include the suspect's "education and intelligence, age, familiarity with the criminal justice system, physical and mental condition, . . . drug and alcohol problems," how explicit the waiver was, and the amount of time between the reading of the rights and any admissions.
>
> [O.D.A.-C., 250 N.J. at 421 (omission in original) (quoting 49 Geo. L.J. Ann. Rev. Crim. Proc. 233-36 (2020)).]

In soliciting a waiver, the interrogating officer should "ask whether the suspect understands his or her rights, and whether, understanding those rights, he or she is willing to answer questions." Tillery, 238 N.J. at 318. "The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances." State v. Kremens, 52 N.J. 303, 311 (1968).

"Our law, however, does not require that a defendant's <u>Miranda</u> waiver be explicitly stated in order to be effective." <u>Tillery</u>, 238 N.J. at 316. "A waiver may be 'established even absent formal or express statements.'" <u>A.M.</u>, 237 N.J. at 397 (quoting <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 383 (2010)). "Indeed, '[a]ny clear manifestation of a desire to waive is sufficient.'" <u>Tillery</u>, 238 N.J. at 316 (alteration in original) (quoting <u>A.M.</u>, 237 N.J. at 397). "Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." <u>Berghuis</u>, 560 U.S. at 384.

Applying these principles, we are satisfied the judge's findings of fact are supported by sufficient credible evidence in the record and accord them the deference our law requires. We are also convinced the judge's application of the totality-of-the-circumstances standard to the facts of the case justified finding an implied waiver. Like the <u>Miranda</u> card used in <u>Tillery</u>, where our Supreme Court observed the <u>Miranda</u> card used did "not reflect optimal law-enforcement practice" and "invited an incomplete inquiry on the question of waiver," <u>Tillery</u>, 238 N.J. at 318, the <u>Miranda</u> card used here did not address whether defendant agreed to waive his rights before answering questions.

A-0616-24

Nonetheless, as in Tillery, "the majority of the factors typically considered in the 'totality of the circumstances' inquiry favor a finding of implied waiver." Id. at 318. As the judge cited, defendant's continuing response to questions in the absence of any pressure to do so, his confident demeanor during his interactions with the officers, his almost immediate response to a question after the administration of Miranda warnings, his comment that he was "going to jail" "regardless," and his extensive prior criminal record and familiarity with the criminal justice system all support a finding of implied waiver in this case.

We reject defendant's newly minted claim that he invoked his right to remain silent by telling the officer "he did not want to incriminate himself." First, the argument was not properly preserved for appellate review. See State v. Robinson, 200 N.J. 1, 19 (2009) ("The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves."). Even if we considered the argument, we are satisfied defendant did not invoke his right to remain silent.

To support his argument, defendant relies on State v. Johnson, 120 N.J. 263, 267-68 (1990), where our Supreme Court reversed the defendant's convictions for two counts of murder, robbery, theft, and weapons charges based on the erroneous admission of the defendant's confession into evidence. The

20

Court concluded "the detectives who interrogated [the defendant] did not scrupulously honor [his] right to remain silent." Id. at 268. There, over the course of about one-and-one-half hours of interrogation, the defendant "continually refused to answer questions about the murders," "repeatedly answered . . . questions with prolonged silences," kept saying "he could not talk about the murders or that he did not want to talk about them," and "star[ed] at the floor for most of the time." Id. at 272, 276. This transpired after the "defendant learned of the charges against him, lost his easygoing confidence, and took on a sullen demeanor." Id. at 275. Under those circumstances, the Court held although the defendant did not say he wanted to stop the interview, the "officers had [a] duty to determine specifically whether [the] defendant's uncooperative responses constituted an assertion of the right to cut off questioning." Id. at 284-85.

The Court elaborated:

> We appreciate that it is the rare suspect who confesses immediately after police questioning begins, and police officers must be accorded reasonable latitude to conduct an interrogation in a manner that permits a reluctant suspect to overcome the natural disinclination to confess to wrongdoing. Such interrogation will often encounter silence, denial, and evasive responses. We hold only that when a suspect's silence and refusal to answer continues, as here, for a prolonged period and is characterized by statements conveying an

21

unwillingness to respond to any questions, then interrogation must cease and the police must affirmatively ascertain whether [a] defendant's refusal to answer constitutes an assertion of the right to discontinue the interrogation.

[Id. at 285.]

Such circumstances were not present here. On the contrary, defendant's ten-minute interrogation was marked by an easygoing tone and tenor. Defendant was responsive to the interrogators' questions and maintained his confidence throughout the interrogation, even after acknowledging that he was probably "going to jail." Defendant never told the officers he wanted the interrogation to stop or that he did not wish to discuss the matter further. We are convinced that under the circumstances, defendant's statement that "he did not want to incriminate himself" cannot reasonably be interpreted as an assertion of his right to remain silent. See State v. Baylor, 423 N.J. Super. 578, 590 (App. Div. 2011) ("We are satisfied that [the] defendant's statement that he could not name the shooter because of his gang affiliation was not an assertion of a right to remain silent.").

III.

In Point II, defendant argues the judge erred in imposing an extended term sentence. He raises an Erlinger v. United States, 602 U.S. 821 (2024), and State

v. Carlton, 480 N.J. Super. 311 (App. Div. 2024), certif. granted, 260 N.J. 478 (2025), challenge, arguing the question of whether he had the predicate convictions to trigger an extended term pursuant to N.J.S.A. 2C:43-6(f) should have been submitted to the jury.

Carlton comes on the heels of Erlinger, in which the United States Supreme Court held that "the Fifth and Sixth Amendments generally guarantee a defendant the right to have a unanimous jury find beyond a reasonable doubt any fact that increases his [or her] exposure to punishment." Erlinger, 602 U.S. at 828, 833-34. The Supreme Court further stated that "[v]irtually 'any fact' that 'increase[s] the prescribed range of penalties to which a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Id. at 834 (second alteration in original) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

Carlton did not focus on the mandatory extended term sentencing provision of N.J.S.A. 2C:43-6(f) as here, but rather the persistent offender provision of N.J.S.A. 2C:44-3(a). Carlton, 480 N.J. Super. at 316. In Carlton, we acknowledged that Erlinger abrogated the rule that had allowed a sentencing court to determine the factual predicates for eligibility for enhanced sentencing under the persistent offender statute. Id. at 325-26. We held that "a unanimous

jury must find beyond a reasonable doubt that all five of the [required] factual predicates are present, or the defendant must admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility." Id. at 328-29.

Unlike N.J.S.A. 2C:44-3(a), N.J.S.A. 2C:43-6(f) does not require a finding of multiple factual predicates. Instead, the statute provides in pertinent part:

> A person convicted of manufacturing, distributing, dispensing[,] or possessing with intent to distribute any dangerous substance . . . under [N.J.S.A. ]2C:35-5 . . . who has been previously convicted of manufacturing, distributing, dispensing[,] or possessing with intent to distribute a controlled dangerous substance . . . shall[,] upon application of the prosecuting attorney[,] be sentenced by the court to an extended term as authorized by . . . [N.J.S.A. ]2C:43-7[(c)], notwithstanding that extended terms are ordinarily discretionary with the court. The term of imprisonment shall, except as may be provided in [N.J.S.A. ]2C:35-12, include the imposition of a minimum term. The minimum term shall be fixed at, or between, one-third and one-half of the sentence imposed by the court or three years, whichever is greater . . . during which the defendant shall be ineligible for parole.
>
> The court shall not impose an extended term pursuant to this subsection unless the ground therefor has been established at a hearing. At the hearing, which may occur at the time of sentencing, the prosecutor shall establish the ground therefor by a preponderance of the evidence. In making its finding, the court shall take

24

judicial notice of any evidence, testimony[,] or information adduced at the trial, plea hearing, or other court proceedings and shall also consider the presentence report and any other relevant information.

[N.J.S.A. 2C:43-6(f).]

In Carlton, we acknowledged a permissible exemption to the Erlinger rule. We pointed out that the Erlinger majority

> emphasized that Almendarez-Torres v. United States, 523 U.S. 224 (1998), recognizes a "narrow exception" that permits "judges to find only 'the fact of a prior conviction.'" Erlinger, 602 U.S. at 836-38 (quoting Alleyne v. United States, 570 U.S. 99, 111 n.1 (2013)). The majority explained that "[a] judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.'" Id. at 831 n.3 (quoting Mathis v. United States, 579 U.S. 500, 511-12 (2016)).
>
> [Carlton, 480 N.J. Super. at 323-24 (alterations in original) (citations reformatted).]

Here, to determine whether N.J.S.A. 2C:43-6(f) applied, the judge had to do no more than determine he had a prior conviction for manufacturing, distributing, dispensing, or possessing with intent to distribute a controlled dangerous substance under N.J.S.A. 2C:35-5. In doing so, the judge did no more than Almendarez-Torres allows.

In considering the State's timely application, the judge determined after reviewing the presentence report, to which there was no objection, that

defendant had a qualifying prior conviction and was thereby subject to a mandatory-extended term. In fact, defendant had three prior drug related convictions under N.J.S.A. 2C:35-5 on his presentence report and conceded he had a prior N.J.S.A. 2C:35-5 conviction.

Accordingly, after appropriate mergers, the judge sentenced defendant on count two to an extended term of thirteen years in prison, one-third of which was to be served without parole. The judge imposed a concurrent three-year term on count one, and a concurrent four-year term on count three. The judge found aggravating factors three, six, and nine based on the high risk of reoffense, defendant's extensive prior criminal record, and the need for deterrence. N.J.S.A. 2C:44-1(a)(3), (6), (9). The judge found no mitigating factors and determined the aggravating factors substantially outweighed the mitigating factors.

Defendant does not challenge the judge's finding or balancing of the aggravating and mitigating factors. Affording the sentence the deference to which it is entitled, we discern no abuse of discretion and are satisfied the judge complied with the applicable sentencing guidelines and imposed a fair sentence. See State v. Fuentes, 217 N.J. 57, 70 (2014) ("Appellate courts review sentencing determinations in accordance with a deferential standard.").

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M. C. Harley*

Clerk of the Appellate Division

A-0616-24